31569.   MILLER SERVICE INC. *v.* MILLER.

144

DECIDED NOVEMBER 22, 1947.

*Allen, Harris & Henson,* for plaintiff in error.
*Walter W. Aycock,* contra.

MACINTYRE, P. J. ■ On appeal to this court, the plaintiff moved to dismiss the bill of exceptions of the defendant for the following reasons: "(1) That the plaintiff in error [defendant] has not filed a replevy bond or any bond conditioned as required by Section 67-803 of the Code, the filing of the said replevy bond conditioned as required by the section being a prerequisite to issue being joined, and to the proceedings returned to the court by the levying officer for trial. (2) The entire proceedings in the trial court, therefore, were a nullity. . ."

The bond which accompanied the affidavit of illegality was in the sum of $12,760 and was conditioned as follows: " . . Whereas, the said principal has interposed its affidavit of illegality and has retained possession of said property. Now therefore, should said property be forthcoming at the time and place of sale in the event that said illegality is dismissed or withdrawn or in the event said affidavit of illegality be not sustained, this bond will be void; otherwise, of full force and effect. . ."

Code § 67-803 provides in part: "When an affidavit of illegality shall be filed as in section 67-801 provided for, and the mortgagor or his special agent or attorney shall give bond, with good and sufficient security, in a sum not larger than double the amount of the execution levied (and when the property levied on is of less value than the execution, the amount of the bond shall be double the value of the property levied upon, at a reasonable valuation to be judged by the levying officer), conditioned for the return of the property when called for by the levying officer, which bond shall be made payable to the plaintiff (who may sue thereon for condition broken), the levying officer shall postpone the sale of said property, and return all the proceedings and papers in the case to the court from which the execution issued, . ."

Because the bond was not conditioned as required by Code § 67-803, the plaintiff contends that the proceedings in the trial court are a mere nullity; that the judgment rendered thereunder is void; that the bond was not amendable; and that "there can be no tryable issue and no action or inaction of counsel would be able to confer jurisdiction of the subject matter on the court by agreement or estoppel."

We do not agree with the plaintiff. A bond given by the defendant in a mortgage fi. fa. when his affidavit of illegality is filed for the purpose of postponing the sale of personal property comes within the provisions of Code § 81-1204, and is amendable. "True it is that the bond given was so defective that the officer should not have accepted it nor returned the papers to the court, but on the contrary should have proceeded to sell the property which he had seized by virtue of the mortgage fi. fa. . . But as he did accept the bond, and return the papers to court for trial, there was in fact a judicial proceeding in progress, and

when that is so, the bond, however defective, is amendable." *Lytle* v. *DeVaughn,* 81 *Ga.* 226 (7 S. E. 281). See, in this connection, *Gelders* v. *Mathews,* 6 *Ga. App.* 144 (64 S. E. 576) ; J. S. *Cowart & Son* v. *Cook,* 55 *Ga. App.* 717 (191 S. E. 173).

The plaintiff made no objections to the form of the bond in the court below and made no motion to dismiss the affidavit. The bond was amendable, and we are of the opinion that the judgment in the trial below cured this amendable defect. *Knight* v. *Gaskins,* 23 *Ga. App.* 788 (1a) (99 S. E. 634) ; *Clark* v. *Harper,* 20 *Ga. App.* 817 (4) (93 S. E. 539) ; American Loan Plan *v* Frazell, 135 Neb. 718 (283 N. W. 836) ; McKee *v.* Metrau, 31 Minn. 429 (18 N. W. 148) ; Grove *v.* Gardiner, 30 R. I. 477 (76 Atl. 178) ; Russell *v.* Russell, 329 Ill. App. 580 (70 N. E. 2d, 70). The motion to dismiss the bill of exceptions is overruled.

■ The judge, sitting without the intervention of a jury, was authorized to find that the evidence showed the following facts: B. R. Miller, the plaintiff, organized Miller Service Inc., a corporation engaged in the filling station and garage business located on Peachtree Road in Buckhead, Atlanta, Georgia. The outstanding stock at the time of organization was $40,000 divided into 400 shares of $100 par value each. Miller put all of the money into the corporation. He hired Lambert as his manager and in consideration of his services he gave Lambert 187 shares of stock without receiving any payment for the same, but Miller kept 213 shares and retained a controlling interest in the corporation. Under its lease, which was introduced in evidence, the corporation had the right to remove as personal property the filling-station building which Miller had erected under a ground lease prior to incorporation. The value of the filling station alone, according to Miller and the audit of the corporation in evidence, was $20,000. The corporation was organized on September 6, 1928, and Miller was elected president and Lambert was elected vice-president and secretary and treasurer. The superior court granted the charter for the corporation on October 8, 1928, and the stockholders held a meeting on October 9, 1928, at which the secretary read the minutes of the meeting of the persons named as directors in the articles of incorporation, which, on motion, duly seconded, were approved; a code of bylaws was adopted and ordered engrossed in the com-

pany book of bylaws. ·On the same day a directors' meeting was called and Miller was unanimously elected president and Lambert was unanimously elected vice-president and secretary and treasurer. The secretary read to the board the code of bylaws adopted by the stockholders in the first meeting, and the code of bylaws was by resolution adopted as the bylaws of the corporation.

Article IV, section 2 of the bylaws provides: "The president shall preside at all meetings; shall have general supervision of the affairs of the company; shall sign or countersign all certificates contracts and other instruments of the company as authorized by the board of directors; shall make reports to the directors and stockholders, and perform all such other duties as are incident to his office or any properly required of him by the board of directors." Article VIII, sections 1, 2, 3, and 4 provide: "1. Any stockholder who desires to sell or transfer his stock shall first offer it for sale to the Miller Service Inc. through the secretary and treasurer at the book value at such time stock is offered for sale. When a stockholder sells his stock without first offering it to the corporation [he or she] shall lose his or her rights of stock transfer or issuance of new stock by the secretary and treasurer. 2. Any additional sale of capital stock shall be first offered to the stockholders who appear on the company's books at such time of sale of additional stock and they shall have the refusal of buying this stock before it is offered through any other channel. 3. It shall be the president's duty to be active general manager of the affairs of the corporation. Either he or the secretary and treasurer or both shall sign on behalf of the corporation all deeds of conveyance, notes, or contracts in the name of the company. They shall have general charge of the office and business of the company. They shall employ and discharge all employees, and do and perform such other duties as may be delegated to them by the board of directors. 4. The president and the secretary and treasurer's salary is to be two hundred twenty-five dollars per month until voted more salary by the stockholders, according to the bylaws as stated heretofore in· Article II, section 4."

On·petition to the superior court an amendment to the original charter was granted on October 17, 1934, to reduce the author-

ized capital stock from $50,000 divided into 50 shares of the par value of $100 each to $10,000 represented by 100 shares of par value of $100 each, but nothing further was done about reducing the stock as authorized by this amendment. On December 3, 1943, however, a resolution was introduced at a special meeting of the stockholders and unanimously adopted: "Inasmuch as it is the desire of the stockholders of this corporation, B. R. Miller, president of said corporation, sells to E. R. Lambert, secretary and treasurer of said corporation, two hundred and twelve (212) shares of his, B. R. Miller's, stock in said corporation, retaining one share and remaining as president of said corporation." Still nothing was done about reducing the capital stock or selling Miller's stock to Lambert. Miller testified that he had operated this business with Lambert as his manager until January, 1945, and since he had other interests he wished to retire from Miller Service, Inc. At this time the corporation owed Miller $6000 evidenced by notes, which amount was shown on the books of the corporation as $6,089.50, and $1700 for taxes he had paid for the corporation. It was shown that Miller had kept the corporation going during hard times and that he had collected none of the $225 monthly salary fixed by the bylaws, which salary began on October 9, 1928, and amounted to approximately $43,000.

In the early part of 1945, Miller began negotiations with Lambert, the vice-president and general manager and only other stockholder, to liquidate his interest in the corporation so that he could wholly retire from all connection with the corporation. The books had been kept loosely and inaccurately. A public accountant, employed after the death of Lambert and some five or six months after the sale to audit the books of the corporation, stated: "We didn't make what we would call an audit of the records because there wasn't sufficient information there for an auditor."

On January 15, 1945, it was agreed between Miller, who had resigned as president, and Lambert, who had been elected president, to compromise in good faith the debts or claims of Miller against the corporation which amounted to some $45,000 or more. It was agreed that the corporation would pay Miller $15,000 and the corporation would acquire Miller's stock in the corporation.

This seems to be authorized by Code (Ann.), §§ 22-1827 and 22-1828, and particularly subsection (d) of the latter wherein it is said: "Subject to such limitation, if any, as may be contained in its charter or any amendment thereto, every corporation shall have the following powers: To purchase, hold, sell and transfer shares of its own capital stock: Provided, that no such corporation shall purchase its own shares of capital stock except from the surplus of its assets over its liabilities, including capital stock: . . Anything to the contrary notwithstanding, a corporation may in any event acquire its shares to collect or compromise in good faith a debt, claim or controversy against the corporation . ."

Accordingly, it was agreed that $2000 would be paid in cash and that the remaining $13,000 would be paid in monthly installments and would be secured by a deed to secure a debt on certain property of the corporation. The $2000 was paid Miller and he gave the following receipt: "Jan. 15, 1945. Received from E. R. Lambert $2,000.00 as down payment on Miller Service, Inc. The balance of $13,000.00 by deed. B. R. Miller." The deed to secure a debt was made to Miller for $13,000, payable in monthly installments, and was signed by Miller Service Inc., by Lambert as president with the seal of the corporation attached. While the deed to secure a debt may appear on its face to be the debt of Lambert, yet, we think the judge, sitting without the intervention of a jury, was authorized to find that the deed to secure a debt was given by the corporation to Miller to acquire Miller's stock in a compromise in good faith of Miller's claims against the corporation.

The court seems to have accepted Miller's explanation of discrepancies, or apparent discrepancies, in his testimony relative to the sale that was finally consummated by the giving of the deed to secure a debt to Miller signed by the corporation by its president, Lambert, with the seal attached, which is here sought to be foreclosed. Miller sometimes used the words "sold to the corporation" and sometimes used the words "sold to Lambert." Miller's explanation was in effect that since he had resigned and Lambert was the president, the only director, officer, or agent of the corporation with whom he could deal when he finally consummated the transaction or sale by accepting the deed to

secure a debt in question, he used these words interchangeably, always meaning that he sold to the corporation of which Lambert was president. Miller's contention that he sold to the corporation rather than to Lambert was corroborated by a witness, Dumas, who heard the words used by Miller and the then president, Lambert, when the transaction or sale now in question was consummated.

The judge might have been strengthened in his opinion that the corporation rather than Lambert personally bought the stock by the evidence that Lambert, up until the time of his death about four months after the sale, paid the $300 monthly installments out of the cash register or the safe of the corporation and did not charge himself with these payments. If Lambert had bought the stock he should have charged himself with such payments. It would have been wrong for him to pay his personal debts out of the corporation funds and not repay the corporation by charging himself on the books, which would have been an easy and a simple matter, or otherwise repaying the corporation. On the other hand, if the corporation had bought the stock, there was nothing wrong in Lambert paying the monthly installments out of the cash of the corporation wherever it was kept.

This case is differentiated from *Brooks-Pruitt Tire Co.* v. *Brooks & Zuker Tire Co.* 192 *Ga.* 644 (16 S. E. 2d, 423), in at least one respect in that the corporation in that case was admittedly insolvent, whereas in the instant case the court could have found that the trial balance as of August 5, 1945, which was prepared by a public accountant after the death of Lambert, was based on such inaccurate books and information that it did not show to the satisfaction of the court that the corporation was insolvent on January 15, 1945, the date of the sale in question. Indeed, the public accountant himself stated: "Our examination was limited due primarily to the lack of supporting information, therefore, the comments contained herein are based largely upon oral explanations given by a former officer of the corporation and an employee." As quoted before, the auditor also stated: "We didn't make what we would call an audit of the records because there wasn't sufficient information there for an auditor." He further stated: "Due to the lack of supporting

information it was impossible to obtain a correct analysis of the surplus accounts." See, in this connection, Ga. L. Ex. Sess. 1937-1938, pp. 214, 224; Code (Ann.), § 22-1828 (d). The other cases cited by the plaintiff in error were decided prior to the corporation act of 1938.

■ Special grounds one, two, and three relate to the objections made to the introduction of evidence on the ground that the evidence was "immaterial and irrelevant, and was harmful and prejudicial as against movant." In *Franklin* v. *Mayor &c. of Macon,* 12 *Ga.* 257, 261, Justice Lumpkin, speaking for the court, said: "I have long been satisfied that we are too hide-bound and restricted in our practice, with regard to the admissibility of evidence. The books of Reports will show that there is no State in the Union, and no country in the world, where there are as many captious objections made to testimony. It is high time that the practice should be discouraged." In *Sample* v. *Lipscomb,* 18 *Ga.* 687 (1), it is said: "Every fact or circumstance serving to elucidate or throw light upon the issue being tried, constitutes proper evidence in the case." In *Keener* v. *State,* 18 *Ga.* 194, 225 (63 Am. D. 269), it is said: "All the circumstances of a transaction may be submitted to the Jury, provided they afford any fair presumption or inference as to the matter in issue. This proposition is exceedingly broad, and if carried out in good faith, would produce the most beneficial results." In *Carter* v. *Marble Products Inc.,* 179 *Ga.* 122 (175 S. E. 480), the rule where the admissibility of evidence is doubtful is stated as follows: "Where the admissibility of evidence is doubtful, the rule in this State is to admit it for the consideration of the jury under proper instructions from the court."

Applying the above stated rules to the assignments of error contained in special grounds one, two, and three of the amended motion for new trial, the grounds are not meritorious.

The evidence authorized the judgment of the trial judge sitting without the intervention of a jury, and the judge did not err in overruling the motion for new trial as amended.

*Judgment affirmed. Gardner and Townsend, JJ., concur.*