Irbco Corporation v. Commissioner.
Irbco Corp. v. Commissioner
Docket No. 4233-63.
United States Tax Court
T.C. Memo 1966-67; 1966 Tax Ct. Memo LEXIS 213; 25 T.C.M. (CCH) 359; T.C.M. (RIA) 66067; March 31, 1966
E. Michael Masinter, Sixth Floor, First Nat'l Bank Bldg., Atlanta, Ga., for the petitioner. Arthur P. Tranakos, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1957, 1958, 1959 and 1960, in the respective amounts of $11,710.77, $1,094.00, $1,355.73 and $4,555.87. The issue for decision is whether petitioner is entitled to a bad debt deduction in the taxable year 1960 in the amount of *214 $56,450 resulting in a net operating loss in that year which is an operating loss carryback to the taxable years 1957, 1958 and 1959. Findings of Fact Some of the facts have been stipulated and, except as to those facts concerning the acquisition by certain related parties of stock in Bankers Fire & Marine Insurance Co., to the relevancy of which petitioner objected, are found accordingly. The portions of the stipulated facts to which petitioner objected which we deem relevant are specifically included in our findings of fact. Irbco Corporation (hereinafter referred to as petitioner), a corporation incorporated under the laws of Georgia on October 11, 1954, filed its Federal income tax returns for the calendar years 1957, 1958, 1959 and 1960 with the district director of internal revenue, Atlanta, Georgia. Immediately after incorporation petitioner's total outstanding stock consisted of 12 shares of $100 par value common stock which were owned as follows: A. F. Irby, Sr.
4
A. F. Irby, Jr.
4
W. Neal Irby
4
(sometimes referred to as W. N. Irby) A. F. Irby, Jr. and W. Neal Irby are sons of A. F. Irby, Sr. The only change in the stock ownership of petitioner *215 from its incorporation until after December 31, 1958 was that after the death of A. F. Irby, Sr. on December 27, 1957, his 4 shares were owned by his estate. The executors of the estate of A. F. Irby, Sr. were the Trust Company of Georgia and W. Neal Irby. The 4 shares of stock in petitioner were distributed by the executors of the estate of A. F. Irby, Sr., to his widow, Daisy Irby, in August 1960. Petitioner was incorporated for the general purposes of buying, holding, owning, improving, renting and selling both real and personal property, and performing all acts incidental thereto. Petitioner owned an office building located at 1829-1847 Peachtree Road, Atlanta, Georgia, (hereinafter referred to as the Peachtree building), which it leased to three tenants, one of which was A. F. Irby & Co., Inc. (hereinafter referred to as Irby & Co.). Irby & Co. leased approximately 80 percent of the premises. Southeastern Aviation Underwriters, Inc. (hereinafter referred to as Southeastern) was a sub-lessee of Irby & Co. of a portion of the Peachtree building with no written agreement. Southeastern was incorporated under the laws of Georgia in 1947 with three shares of common stock, one share *216 being issued to A. F. Irby, Sr., one to A. F. Irby, Jr., and one to V. W. McKinney, Jr., for the primary purpose of acting as an agent and representing insurers or underwriters in connection with insurance coverage on aircraft hulls, aircraft liability and airport liability insurance and the undertaking of underwriting powers delegated to it by these insurers or underwriters. On February 5, 1948, the share issued to V. W. McKinney, Jr., was transferred to W. Neal Irby. Since the death of A. F. Irby, Sr., his share has been held by his widow, Daisy N. Irby. Pursuant to the terms of the lease agreement between petitioner and Irby & Co., the lessee was required to bear all expenses of improvements, except normal maintenance of the building. In 1955 Irby & Co. made $113.150 of improvements on the leased property. Irby & Co. was engaged in the insurance brokerage business acting as general agent for insurance companies in the southeastern part of the United States. It was incorporated under the laws of the State of Georgia in November 1947. Its capitalization at the time of incorporation was 100 shares of no par common stock, 51 shares issued to A. F. Irby, Sr., and 49 issued to A. F. *217 Irby, Jr. On November 30, 1950, the capitalization was increased to 1,000 shares no par common stock. An additional 459 shares were issued to A. F. Irby, Sr., and 441 shares to A. F. Irby, Jr. In 1957 W. N. Irby became the owner of 200 shares of the common stock of Irby & Co. through gifts of 110 shares by his father, A. F. Irby, Sr., and 90 shares by his brother, A. F. Irby, Jr. At that time the individual stockholdings were 400 shares by each A. F. Irby, Sr., and A. F. Irby, Jr., and 200 shares by W. Neal Irby. At the death of A. F. Irby, Sr., his 400 shares of stock were, according to his will, bequeathed to Irby & Co. In January 1958, A. F. Irby, Jr., transferred 40 shares of his stock in Irby & Co. to W. N. Irby. Following this transfer, the stockholdings in Irby & Co. were 360 shares owned by A. F. Irby, Jr., and 240 shares owned by W. Neal Irby. At that time the shares which were owned by A. F. Irby, Sr., at the date of his death were held by his estate. This stock ownership in Irby & Co. remained unchanged until after December 31, 1958, at which time the books of Irby & Co. showed, as they had at December 31, 1957, as outstanding 1,000 shares of no par common stock listed at *218 $46,250.47. On or about March 3, 1955, petitioner obtained a loan from New England Mutual Life Insurance Company in the amount of $200,000 for the purpose of financing the purchase of the Peachtree building and gave as security therefor a deed to secure debt covering this property. On or about November 24, 1958, petitioner refinanced this indebtedness by obtaining a loan in the amount of $300,000 from Liberty Life Insurance Company and concurrently therewith repaid the remaining unpaid obligation to New England Mutual Life Insurance Co., which at the time was $168,133.08. The purpose of the refinancing was to obtain funds for development of the north end of the Peachtree building property for occupancy by doctors practicing in a nearby hospital. Extensive plumbing and electrical work were needed for such development of the property. The monthly repayment on the note to Liberty Life Insurance Co. including principal and interest at the rate of 5 1/2 percent per annum, was $2,853. On or about November 25, 1958, petitioner advanced to Irby & Co. the sum of $100,000. This advance was entered on the books of petitioner under "Accounts Receivable - A. F. Irby & Co., Inc." and designated"Loan *219 to Irby." The $100,000 was entered on the books of Irby & Co. under "Accounts Payable - Irbco Corp." and was designated as a "Loan fr. Irbco Corp." The certified financial statement of Irby & Co. for the year ended December 31, 1958, showed a liability in the form of an account payable to petitioner in the amount of $98,823.16. The certified financial statement of petitioner for the year ended December 31, 1958, showed an account receivable from Irby & Co., in the amount of $98,823.16. The amount, $98,823.16, represents the $100,000 advanced to Irby & Co., by petitioner with a minor adjustment for the purpose of preparing a consolidated financial statement. Petitioner did not receive promissory notes to evidence its advances to Irby & Co. The advances bore no interest and no collateral was given as security. In November 1958, Irby & Co. had accounts payable to the insurance companies which it represented in substantial amounts and accounts receivable from its insurance agents in similar or larger amounts. The lag between collection by Irby & Co. from its agents and the due dates of payments to the insurance companies caused Irby & Co. to be in a poor cash position. Such a situation *220 was not uncommon in the business of Irby & Co. or other general insurance agencies. Irby & Co., frequently borrowed substantial sums up to $200,000 from the Trust Company of Georgia on short-term loans and occasionally borrowed on a shortterm basis from other sources. The advance by petitioner to Irby & Co. was intended to assist Irby & Co. to meet current obligations in anticipation of receipts from its local agents. The certified balance sheet of Irby & Co. as of December 31, 1958 shows the following balances in the accounts indicated: Cash
Bank accounts
$103,965.12
Petty cash
100.00
$ 104,065.12
Accounts receivable - Agents
2,326,732.31
Less - Reserve for Bad Debts
(24,163.49)
Accounts Payable - Companies
1,838,361.93
Total accounts payable
2,197,632.73
The books of Irby & Co. for the year ending December 31, 1958, show open accounts payable by A.F. and W. N. Irby for income taxes in the respective amounts of $3,506.67 and $4,572.68. The Reconcilement of Surplus Statement of Irby & Co. for the year 1958 shows "Dividends Paid in 1958- 50,000." As of November 26, 1958, Irby & Co. was solvent and was operating profitably. It had total assets *221 of $2,821,081.51, including current assets of $2,625,542.99 and total liabilities of $2,707,842.25 at the end of 1958. Its surplus was $66,981.79 at the end of 1958. In 1958 Irby & Co. had a net profit before taxes of $103,210.69 and a net profit after taxes of $42,210.69. Only $4,133.69 of its income represented net capital gain. Its gross income for 1958 was composed of the following items: Commissions Earned
$3,389,546.59
Less Commissions Paid
2,224,854.98
$1,164,691.61
Misc. Commissions
10,747.30
Dividends
3,980.80
Interest
920.23
Misc. Income
17,484.97
Recovery of Bad Debts
1,925.73
Gross profit
$1,199,750.64
Irby & Co. had a more profitable year in 1958 than in 1957 when it earned commissions of approximately $2,700,000 and had a gross profit of approximately $900,000 and a net profit before taxes of $43,382.33. The books of Irby & Co. show the following total assets and surpluses as of the end of 1957 and 1958: 1957
1958
Total Assets
$2,624,247.85
$2,889,092.73
Surplus *
161,998.66
185,236.75
The books showing these total assets and *222 surplus accounts contain no reserve for bad debts, do not provide for Federal and State taxes, and list investments at cost. Insurance businesses as going concerns are typically valued on the basis of the net premiums or commissions they earn. Such a business generally would have a value of from one-half of to one and one-half times its net annual commissions. This is because renewal commissions are generally earned for a number of years after the original insurance policy has been written. By such method, as of the end of both 1958 and 1959 the general insurance agency business of Irby & Co. had a value of between $500,000 and $1,000,000. The value of the general insurance agency business of Irby & Co. resulted from its contracts with the insurance companies, its agreements with local agents representing the company, and the prospects of receipts of renewal commissions on outstanding policies. During 1959 and 1960, Irby & Co. made repayments to petitioner on the $100,000 which petitioner had advanced to it as follows: Date
Amount
February 2, 1959
$10,000.00
March 26, 1959
5,000.00
May 29, 1959
5,000.00
July 31, 1959
2,000.00
August 14, 1959
8,000.00
October 29, 1959
5,000.00
December 21, 1959
2,000.00
February 4, 1960
2,000.00
April 1, 1960
1,300.00
July 2, 1960
2,000.00
July 27, 1960
800.00
October 10, 1960
800.00
$43,900.00
*223 On June 13, 1960, petitioner made an additional advance to Irby & Co. of $350. Since October 10, 1960, Irby & Co. has made no payments to petitioner on the advances made by petitioner to it. As of December 31, 1959, Irby & Co.'s records show its accounts receivable from agents as $1,401,698.25 and its accounts payable to insurance companies as $1,478,685.10, total assets as $2,223,455.60 and surplus as $20,839.69. This asset figure as of December 31, 1959, reflects no reserve for bad debts and investments are listed at a cost figure. The investment account included 43,981 shares of the common stock of Bankers Fire and Marine Insurance Company. Three thousand of these shares had been purchased in November 1958 and June 1959 at $20 per share. Forty thousand of these shares were received by Irby & Co. in a two-for-one conversion in late 1959 of 20,000 preferred shares which Irby & Co. had previously purchased directly from Bankers Fire and Marine Insurance Company. Irby & Co.'s purchases of Bankers Fire and Marine Insurance Company stock were made with the proceeds of a $195,000 loan from the First National Bank of Atlanta, Georgia, for which a promissory note of Irby & Co., personally *224 endorsed by A. F. Irby, Jr. and W. Neal Irby, was given to the bank. The indebtedness was secured by a pledge of approximately 20,000 shares of preferred stock of Bankers Fire and Marine Insurance Company. In February 1960 Irby & Co. sold its entire 43,981 shares of Bankers Fire and Marine Insurance Company stock for $3.50 per share. The uncertified balance sheet of Irby & Co. as of December 31, 1959, bears a pencil notation, "$196,000.00," following the investment account of $301,053.43 shown thereon. A similar pencil notation, "$40,000 uncollectible," appears next to the balance of accounts receivable from agents. At December 31, 1959, Irby & Co.'s books also showed as assets bank accounts and cash of $99,733.64, a loan to W. N. Irby of $32,999.99, a loan to Southeastern Life Managers (a wholly-owned subsidiary) of $23,132.66, cash surrender value of life insurance of $26,836.07, and deferred debits of $122,320.92, as well as the investment account and accounts payable from agents as recited above. The books also showed, along with other smaller assets, an open account in the name of Mrs. Daisy Irby of $4,052.47. The books of Irby & Co. showed as liabilities at December 31, 1959, besides *225 accounts payable to insurance companies of $1,478,685.10 as recited above, an account payable to"Irbco" (petitioner) of $63,000, an account payable to "S. E. Aviation Und." (Southeastern) of $68,800, and notes payable of $524,132.37. During the year 1958 A. F. Irby, Jr., was president and a director of petitioner and an officer and director of Irby & Co. He ceased being an officer and director in both companies in June 1959, but sometime in 1959 A. F. Irby, Jr., purchased all of the stock which his brother W. Neal Irby owned in petitioner, thereby acquiring two-thirds ownership. The brothers were also negotiating regarding a sale by A. F. Irby, Jr., of all of the stock which he owned in Irby & Co. The minutes of a meeting of the executive committee of Irby & Co. on November 13, 1959, read in part: Next, the President reported that he had had several conferences with his brother, A. F. Irby, Jr., relating to the proposed acquisition by the Company of A. F. Irby, Jr.'s stock in the Company and expressed the hope that those negotiations would be concluded at an early date, requesting that the Executive Committee grant him authority to continue those negotiations and to consummate *226 the acquisition as soon as he was able to reach an accord as to the amounts involved with his brother. He outlined the nature of his discussions with his brother and stated that he and his brother contemplated that the consideration to be paid by the Company for his brother's stock would include the following: the assumption by this Company of his brother's individual obligation to Trust Company of Georgia evidenced by a note in the principal amount of $63,294.39, with the understanding that his brother's collateral would remain as security to that indebtedness until it was paid, but that upon the payment of that indebtedness, the collateral would be returned to A. F. Irby, Jr. He further reported that at the present time, A. F. Irby, Jr. was indebted to the Company in the amount of $16,976.68, which represented an advance of $7,000.00 in cash and miscellaneous furniture and an automobile at book value, plus miscellaneous other charges held for the time being in an account the Company designated as a "Sales Account," plus $4,715.00 in the form of a loan account, $2,686.67 in an income tax account, and $34,718.17 in an account carried as a personal account, and that he and his brother *227 had discussed writing off the aggregate amount of those accounts as the remaining consideration for the acquisition of his stock, although the parties had not yet had a full meeting of minds on the matter, and requested that the Committee grant him authority to acquire for the Company the stock of A. F. Irby, Jr., in the Company for the consideration above outlined. Whereupon, the Executive Committee unanimously RESOLVED That W. N. Irby, the President of the Company be and he is hereby authorized for and in the name of the Company to purchase from A. F. Irby, Jr., all of his stock in the Company on the basis above outlined. Subsequent to November 13, 1959, and prior to March 12, 1960, the brothers entered into an agreement that A. F. Irby, Jr., would sell all of the stock which he owned in Irby & Co. to the company. The consideration which it was agreed would be paid by Irby & Co. for the stock was the assumption of the debt of A. F. Irby, Jr., to the Trust Company of Georgia in the amount of $63,294.39, the cancellation of the indebtedness of A. F. Irby, Jr., to Irby & Co., and the agreement of Irby & Co. to employ A. F. Irby, Jr., in a consulting capacity. Under the terms of *228 the agreement, A. F. Irby, Jr., was not relieved of liability on his note to the Trust Company of Georgia. The consummation of the sale of the stock was contingent upon Irby & Co. paying the debt owed by A. F. Irby, Jr., to the Trust Company of Georgia. Under date of March 12, 1960, A. F. Irby, Jr., executed the assignment form on the back of his certificate for 360 shares of Irby & Co. stock, designating Irby & Co. as the assignee. In late 1959, W. Neal Irby approached representatives of another general insurance agency in Atlanta, Hurt and Quinn, relative to that company's purchasing the stock or business of Irby & Co. or the two companies merging. Negotiations between the two companies had not been concluded on February 16, 1960. On that date Irby & Co. advised the insurance companies it represented that it was unable to pay its November 1959 balances. Under the agency agreements, the insurance companies, upon receipt of this notice, were entitled to terminate their relationships with Irby & Co. immediately and to take over its operations. A meeting was held in New York between representatives of Irby & Co. and representatives of all the insurance companies for which Irby & Co. *229 acted as agent in February 1960. At that meeting, the insurance companies agreed to give forbearance to Irby & Co., and to help it straighten out its financial affairs so that it could remain on a current basis with the insurance companies. A custodianship of assets of Irby & Co. was established and Irby & Co. continued to operate the business. The arrangement did not prove successful. W. Neal Irby approached representatives of another general agency in Atlanta, Kinnett-Edwards-Boyd, Ltd. (hereinafter referred to as KEB) and told them that if they were willing to assume the business, he would prevail upon the insurance companies to transfer their agencies to KEB. In March 1960, the entire insurance business of Irby & Co. was transferred to KEB, which had no affiliation with Irby & Co. KEB acquired the accounts receivable of Irby & Co. and assumed the accounts payable to the insurance companies. KEB agreed to meet any deficit to the insurance companies, relieving Irby & Co. of such liability. No consideration was paid to Irby & Co., except that KEB agreed to apply a portion of the renewal commissions from the business previously written by Irby & Co. on the obligations of Irby & *230 Co. to the insurance companies. Under this arrangement, the amounts owed the insurance companies were satisfied in several years. Since March 1960, Irby & Co. has not actively engaged in the insurance business. After that time, Irby & Co. had no further right to any part of any commissions collected on business it had done, nor on any renewals, and it never received any such commissions. Irby & Co. remained in existence after the transfer of its insurance business to KEB, retaining its other assets and liabilities. Among the liabilities of Irby & Co. which were not assumed by KEB were accounts payable to petitioner, accounts payable to Southeastern and notes payable of approximately $524,132.37. Southeastern had advanced to Irby & Co. the following amounts on the dates indicated: Date
Amount
February 29, 1959
$ 50,000.00
April 30, 1959
14,000.00
June 30, 1959
7,000.00
September 10, 1959
21,800.00
November 3, 1959
7,000.00
April 30, 1959
26,767.17
January 26, 1960
13,350.00
January 26, 1960
22,650.00
February 5, 1960
3,300.00
$145,267.17
Irby & Co. made the following repayments to Southeastern: Date
Amount
July 9, 1959
$ 5,000.00
July 23, 1959
5,000.00
October 26, 1959
10,000.00
October 30, 1959
10,000.00
March 31, 1959
12,595.26
June 24, 1959
15,171.91
July 20, 1960
232.73
October 31, 1960
148.58
$58,148.48
*231 As of October 31, 1960, Southeastern wrote the amount still owed to it by Irby & Co. off its books as an uncollectible debt. The current books and records of Irby & Co. were turned over to the bookkeeper of KEB when that company took over the insurance business of Irby & Co. Eliminating items relating to insurance company receivables and payables which were transferred to KEB, these records show the following assets and liabilities of Irby & Co. as of December 31, 1960: Assets
Cash
$ 9,918.67
Officers and Employees: Wm. Neal Irby
32,770.09
H. R. Seawell, Jr.
500.00
J. E. McKain
220.00
Affiliates *
20,853.63
Cash surrender value of life in-
surance
1,820.71
Investments: Ga. Casualty and Surety Co.
2,460.00
Southern Airways
2,250.00
Southeastern Life Managers
200.00
Southern Merchandise Mart
10,000.00
A. F. Irby & Mrs. Daisy N. Irby
5,100.34
Deferred Debits
122,320.91
Total Assets
$208,414.35
Liabilities and Net Worth
Accounts Payable
Affiliates
Southeastern Aviation Und.
$107,568.69
Irbco (petitioner)
56,450.00
Notes Payable
63,294.39
Accrued Expenses Payable
311.66
Capital Stock
46,257.47
Deficit
(65,467.86)
Total Liabilities and Net Worth
$208,414.35
*232 The asset of Irby & Co. termed "Deferred Debits - $122,320.92" first appeared as such on the balance sheet of Irby & Co. as of December 31, 1959. The account was composed of the following items, the first four of which had previously appeared on the books of Irby & Co. under the listed designation: A. F. Irby, Jr. - Sales Account
$ 16,976.68
A. F. Irby, Jr. - Personal Account
34,648.17
A. F. Irby, Jr. - Personal Income
Tax Account
2,686.67
A. F. Irby, Jr. - Loan Account
4,715.01
Trust Company of Georgia - Note
63,294.39
$122,320.92 *
The "Deferred Debit" account was set up by an accountant who had worked for Irby & Co. and became employed by KEB when that company took over the business of Irby & Co. This accountant established the "Deferred Debit" account at the direction of the attorney for Irby & Co. There was no change in the "Deferred Debit" account from the time it was set up to December 31, 1960, except for the one-cent correction above referred to. On his individual income tax return for the year 1961 A. F. Irby, Jr., reported *233 the sale of his stock in Irby & Co. and gave the following explanation of the transaction: A. F. Irby, Jr. was formerly an officer and stockholder in A. F. Irby & Company, Inc. In 1959 Mr. Irby resigned as an officer and director of that company and in February 1960 agreed to sell his entire capital stock in the company, 360 shares, to A. F. Irby & Company, Inc. At the date of this agreement Mr. Irby individually owed the Trust Company of Georgia a personal, secured note with a balance due of $63,294.29 [$63,294.39]. Under the terms of the proposed sale of this stock by Mr. Irby, A. F. Irby & Company, Inc. agreed to pay Mr. Irby's above mentioned loan to the Trust Company of Georgia and to waive collection of certain amounts alleged to be owed to A. F. Irby & Company, Inc. by Mr. Irby. Mr. Irby was not relieved of his liability on the note to the Trust Company of Georgia and the proposed sale was contingent upon A. F. Irby & Company, Inc. paying the note. A. F. Irby & Company, Inc. made no payments on the above mentioned note to the Trust Company of Georgia in 1960. In 1961 they paid $31,647.15 and Mr. Irby personally paid $31,647.14 thereby liquidating this indebtedness. *234 In February 1960 A. F. Irby & Company, Inc. carried four different receivables accounts against Mr. Irby, which according to their records, aggregated $59,096.53. The balance was at all times in dispute and, in Mr. Irby's opinion, consisted principally of erroneous charges. In the purchase of this stock by the company, and the sale by Mr. Irby, the company agreed to waive collection of any part of these accounts. Mr. Irby contends that the maximum balance due by him should be $14,649.25. Accordingly the net proceeds from the sale of this stock are computed as follows: Paid by A. F. Irby & Com-
pany, Inc. to Trust Co.
of Georgia
$31,647.15
A. F. Irby, Jr. Account with
A. F. Irby & Company,
Inc. waived
14,649.25
$46,296.40
On its income tax return for 1960 petitioner reported a net operating loss of $41,263.77, after deduction from income of a bad debt due from Irby & Co. of $56,450. Petitioner filed claims for refund for the years 1957 to 1959 on net operating loss carrybacks and received tentative allowances as follows: Tax liability
Taxable
Net operating
Shown on
Carryback
Year
income
Deduction
loss carryback
return
adjustment
1960
$15,186.23 *
$56,450.00 **
($41,263.77)
0
0
1957
33,098.00
33,098.00 ***
( 8,165.77)
$11,710.97
$11,710.97
1958
3,646.67
3,646.67 ***
( 4,519.10)
1,094.00
1,094.00
1959
12,197.00
4,519.10 ***
3,659.00
1,355.63
*235 Respondent in his notice of deficiency disallowed the claimed bad debt deduction for the year 1960 and the net operating loss carryback deductions with the explanation that petitioner had not established that it was entitled to a bad debt deduction in 1960 on the basis of the advances previously made to Irby & Co. Ultimate Facts 1. The advance of $100,000 by petitioner to Irby & Co. in November 1958 gave rise to a debtor-creditor relationship. 2. The advance of $350 by petitioner to Irby & Co. in June 1960 did not give rise to a debtor-creditor relationship. 3. Petitioner has failed to establish that the debt owed to it by Irby & Co. became worthless in 1960. Opinion Section 166(a)(1) of the Internal Revenue Code of 1954 provides for the allowance of a deduction for a debt which becomes worthless within the taxable year. Section 1.166-1(c), Income Tax Regulations, states that only a bona fide debt qualifies *236 under section 166 and defines a bona fide debt as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Respondent contends that the advances of $100,000 in November 1958 and $350 in June 1960 which petitioner made to Irby & Co. were not bona fide debts and that if the advances were bona fide debts they did not become worthless in the taxable year 1960. In this case, at the time the advance of the $100,000 was made by petitioner to Irby & Co., the same persons were the stockholders of each of the corporations. The relationship between the lender and the borrower requires that the transaction be given close scrutiny to determine whether the advance was in substance a contribution to the capital of Irby & Co. and not a loan. From a close examination of the facts in this record we agree with petitioner that the advance of $100,000 by petitioner to Irby & Co. was intended by both the lender and the borrower to be a loan and that it was in fact a loan. The fact that there was common ownership and control *237 of the lender and borrower at the time the loan was made does not preclude the existence of a real debtor-creditor relationship. The question of whether a debtor-creditor relationship exists is one of fact. Victor Shaken, 21 T.C. 785 (1954). Baumann v. Commissioner, 312 F. 2d 557 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court. The substance and not the form of the transaction is controlling. Gilbert v. Commissioner, 262 F. 2d 512 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court. The true intent of the parties is to be gleaned from all the surrounding circumstances including the bookkeeping entries, the expressions of the parties to the transaction and the financial condition of the borrower and the expectation of repayment. Sam Schnitzer, 13 T.C. 43, 60 (1949), aff'd. 183 F. 2d 70 (C.A. 9, 1950). Essential to the creation of a debtor-creditor relationship is the existence of a reasonable expectation *238 of repayment at the time of the transaction. The evidence here shows that in November 1958 there was a reasonable expectation in both parties that Irby & Co. would repay. At that time the borrower needed the money to pay to the insurance companies it represented and expected to receive the covering payments from its local agents in a relatively short time. The lender needed to be repaid the money in a short time to meet its current obligations. Both parties entered the advance on their books as an account to be repaid and, consistent with that entry, substantial repayments were begun within two months and continued with some regularity (although ultimately faltering and eventually failing) until almost half of the advance had been repaid. Although book entry of an advance as a debt is not conclusive, when the contemporaneous behavior of the parties harmonizes with the form they have given the transaction, as the repayments here conformed with the type of accounts established by petitioner and Irby & Co. the fact cannot be brushed aside as a matter of mere form lacking import, but must be considered as having some weight in showing the intent of the parties at that time. Respondent *239 belittles the significance of the repayments made by Irby & Co. He states that even substantial repayment "doesn't control" as a reflection of what the parties intended when the loan was made, citing Schine Chain Theatres v. Commissioner, 331 F. 2d 849 (C.A. 2, 1964), affirming per curiam a memorandum opinion of this Court; American-LaFrance-Foamite Corp. v. Commissioner, 284 F. 2d 723 (C.A. 2, 1960), affirming a memorandum opinion of this Court, certiorari denied 365 U.S. 881; and Hoguet Real Estate Corp., 30 T.C. 580 (1958). All of these cases involved repayments but in none was there a substantial repayment at a time when no further advances were being made. Furthermore, the factual complexions of all three are unlike that here present. Two involved advances to new businesses with unproven earning ability. In the other, the borrower had no income in several of the years during which advances were made. These factors overcame the importance of repayments. The pattern and extent of repayment here strongly indicates the initial expectation of repayment, and it is not overcome by other factors. Respondent's second attack on the *240 repayment factor is his argument that the obligation to repay was contingent. There is no debt when the obligation is subject to a condition precedent which has not occurred, Zimmerman v. United States, 318 F. 2d 611 (C.A. 9, 1963); Bercaw v. Commissioner, 165 F. 2d 521 (C.A. 4, 1948), affirming a memorandum opinion of this Court, or, under certain circumstances, a condition which may terminate or suspend the obligation, such as failure of dividends when repayment is to be made only out of dividends. See Inman-Poulsen Lumber Co. v. Commissioner, 219 F. 2d 159 (C.A. 9, 1955), affirming a memorandum opinion of this Court. These cases involved situations in which repayment was to be made from a restricted source such as a judgment recovery, dividends or earnings or profits. Petitioner's advance to Irby & Co. was not to be repaid from any specified source and was not to be repaid only from earnings. Respondent points to a statement by one of petitioner's witnesses that "repayment hinged on A. F. Irby & Co., Inc.'s ability to repay." Repayment always hinges *241 on the ability of the borrower to repay if the debt is unsecured. However, Irby & Co. was not discharged from its obligation to repay whether or not it had earnings and the testimony to which respondent refers, considered in context, does not indicate otherwise. Respondent cites, as supporting his position, cases such as Rudolf A. Zivnuska, 33 T.C. 226 (1959). That case involved advances of money for the use of a corporation in which the taxpayer was a stockholder at a time when the corporation was insolvent and in receivership. Irby & Co. was not insolvent or in receivership in November 1958 when petitioner advanced the $100,000. In fact it was operating profitably and its financial condition was such that repayment of the advance could be reasonably expected. Respondent cites the lack of instrument evidencing the loan, provision for interest thereon, or security for the loan as inferences unfavorable to loan characterization of the transaction. None of these factors is vital where the other factors discussed above indicate that the intention of all the parties was that the advance was a loan. A. F. Irby, Jr., and W. Neal Irby both testified that the advance of the *242 $100,000 was intended as a loan and that they both expected that the loan would be promptly repaid. There was no specific maturity date for the loan since the parties viewed it in the nature of a demand loan to be repaid promptly. Respondent also maintains that Irby & Co. could not have obtained a loan elsewhere. There is evidence in the record that Irby & Co. did obtain loans elsewhere, and the indication is that one of these loans may have been contemporaneous with petitioner's loan to Irby & Co. It is stipulated that Irby & Co. secured a loan of $195,000 from the First National Bank of Atlanta to make stock purchases. While the stipulated fact is somewhat vague, literally read, it refers to the stock purchases made by Irby & Co. in November 1958 and June 1959. The note evidencing this loan was endorsed by A. F. Irby, Jr., and W. Neal Irby, personally, and the loan was secured with collateral. Nevertheless, if this loan were made around November 1958, it was a loan from an unrelated party made at approximately the same time as the advance of $100,000 by petitioner. We conclude that in November 1958 petitioner's expectation of repayment of its advance to Irby & Co. was reasonable. *243 Irby & Co. was doing approximately a $10 million business a year and it was operating profitably, more so in 1958 than in the previous year. Its assets exceeded its liabilities in 1958 by more than in the previous year. In addition to the evidence indicating that the parties intended a loan when the $100,000 was advanced, there is evidence negating a capital contribution intent. Petitioner had a business purpose in making the advance. Irby & Co. was the tenant of 80 percent of petitioner's building. Irby & Co. was having cash problems which petitioner's officers believed to be temporary. Petitioner advanced funds (which were on hand only because it had just refinanced a loan so that it could extend its rental facilities) in order to save its major tenant from failure. Petitioner advanced $350 to Irby & Co. in June 1960. The evidence concerning this advance is meager. The circumstances of Irby & Co. were such at this time that an unrelated party would have been very unlikely to make such an advance to Irby & Co. Irby & Co. had lost its business by June 1960 and was engaged only in paying creditors. The evidentiary facts establish that this advance was not a bona fide loan. *244 Both parties have offered voluminous citations concerning the many points touched upon by each. Both parties recognize, however, that whether an advance is a loan is a question of fact, Victor Shaken, supra, C. L. White, 17 T.C. 1562 (1952), which must be determined by consideration of the circumstances surrounding the loan, John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). We have found as an ultimate fact that the advance of $100,000 made by petitioner to Irby & Co. in November 1958 was a loan, not a contribution to capital, and that the $350 advance in June 1960 was not a bona fide loan. The remaining question is whether the debt of Irby & Co. to petitioner became worthless in 1960. Respondent contends that the debt did not become worthless in 1960 since Irby & Co. (the debtor) possessed assets at December 31, 1960, against which petitioner could have proceeded to collect the debt. Respondent refers specifically to an asset carried on the debtor's books under the name "Deferred Debits," in the amount of $122,320.91, which first appeared in its 1959 year-end balance sheet and remained unchanged up to December 31, 1960. Respondent *245 says that this account actually represents accounts payable by A. F. Irby, Jr., to Irby & Co. Petitioner's first contention is that the position respondent is taking in the instant case is in conflict with the position which respondent is asserting against A. F. Irby, Jr., individually, with respect to the same item in connection with his personal income tax liability. Petitioner argues that such inconsistency is arbitrary, and, therefore, that the burden of proof on this issue is on respondent. Petitioner asserts, relying on Cohen v. Commissioner, 266 F. 2d 5 (C.A. 9, 1959), remanding a memorandum opinion of this Court, that a determination by the Commissioner, if made in an arbitrary and unreasonable fashion, does not carry a presumption of correctness; and that the burden of proof is on the respondent. Petitioner contends that the adoption of inconsistent positions by respondent is arbitrary, relying on Revell, Inc. v. Sidell, 273 F. 2d 649 (C.A. 9, 1959), certiorari denied 364 U.S. 835. The alleged "inconsistent" position which respondent asserts against A. F. Irby, Jr., personally is that the accounts which he owed to Irby & Co. were *246 cancelled and the release of the obligation is income to him. Petitioner states that if the accounts were cancelled before December 31, 1960, it is presumed that they would no longer be assets of petitioner's debtor, Irby & Co., against which petitioner might have sought satisfaction of its debt in 1960. Respondent's assertion against A. F. Irby, Jr., relates to the year 1961, not to 1960. For this reason petitioner's claim of arbitrariness is without merit because there is no conflict. Also, we have held that inconsistent positions taken by respondent against related taxpayers in the alternative are not arbitrary. Nat Harrison Associates, 42 T.C. 601 (1964). Petitioner takes the position that the "Deferred Debits" account never represented accounts payable from A. F. Irby, Jr., to Irby & Co. beyond $59,026.52. While the testimony of A. F. Irby, Jr. indicated that he questioned whether the amount of his indebtedness to Irby & Co. was correctly shown on the books of that company as $59,026.52, the record contains no evidence to show the reason for the position taken by A. F. Irby, Jr. or that he was not indebted to Irby & Co. in the full amount shown on the books of *247 that company. Petitioner does not contend that the indebtedness of A. F. Irby, Jr. to Irby & Co. was less than $59,026.52 but argues that Irby & Co. had cancelled that indebtedness of A. F. Irby, Jr. to it before December 31, 1960, in consideration for the repurchase of its stock owned by A. F. Irby, Jr. The evidence shows that the "Deferred Debit" account consisted of $59,026.52 of debts shown on the books of Irby & Co. as due it from A. F. Irby, Jr., and that the balance of $63,294.39 represented a debt of A. F. Irby, Jr. , to the Trust Company of Georgia and not an amount owed by him to Irby & Co. The testimony concerning the stock repurchase agreement between A. F. Irby, Jr., and Irby & Co. is that a part of the consideration for the repurchase was to be an assumption by Irby & Co. of a note in the amount of $63,294.39 which A. F. Irby, Jr., owed to the Trust Company of Georgia. The testimony of the accountant who set up the "Deferred Debit" account was that it represented amounts owed by A. F. Irby, Jr., to Irby & Co. to the extent of $59,026.52 and the balance represented the note of A. F. Irby, Jr., to the Trust Company of Georgia assumed by Irby & Co. We agree with petitioner *248 that to the extent of $63,294.39, the "Deferred Debits" account did not represent an amount owing by A. F. Irby, Jr. to Irby & Co. and was not in fact an asset of Irby & Co. The remaining portion of the "Deferred Debits" account in the amount of $59,026.52 was an account payable by A. F. Irby, Jr., to Irby & Co. and therefore an asset of the company at December 31, 1960 unless as petitioner contends this account was cancelled as part of the consideration for the purchase by Irby & Co. of its stock held by A. F. Irby, Jr. The evidence shows that at some date subsequent to November 13, 1959, an agreement was entered into between A. F. Irby, Jr., and his brother, W. Neal Irby acting on behalf of Irby & Co., whereby Irby & Co. agreed to purchase its stock owned by A. F. Irby, Jr. The evidence further shows that the consideration for the purchase was to be the cancellation by Irby & Co. of the accounts payable by A. F. Irby, Jr., to the company, the assumption by Irby & Co. of a note which A. F. Irby, Jr., owed to the Trust Company of Georgia, and some form of employment contract for A. F. Irby, Jr. The evidence also shows that under the agreement the sale by A. F. Irby, Jr., to Irby *249 & Co. was conditioned on payment by Irby & Co. of the note of A. F. Irby, Jr., to the Trust Company of Georgia which it had assumed but without relieving A. F. Irby, Jr., of his personal liability on the note and that the stock certificate was endorsed as assigned to Irby & Co. by A. F. Irby, Jr., under date of March 12, 1960. Whether this certificate was delivered to the company on that date or on any date prior to December 31, 1960 is not shown. In our opinion, it is unnecessary to resolve the question of whether the agreement by Irby & Co. to buy its stock held by A. F. Irby, Jr., was consummated, and if so when, in order to determine the question presented in this case. It is only necessary that we determine whether as of December 31, 1960, there were assets of Irby & Co. from which petitioner might reasonably have collected the debt owed it by Irby & Co. If a creditor of Irby & Co. during 1960 and as of December 31, 1960, would have had a superior claim on the assets of Irby & Co., including the $59,026.52 indebtedness of A. F. Irby, Jr., to the company, to any claim which A. F. Irby, Jr., might have because of the sale of his stock to that company, our question is resolved *250 since the record shows that as of December 31, 1960, Irby & Co. had assets of $145,119.96 without considering the $63,294.39 portion of the "Deferred Debits" account which represented the note payable by A. F. Irby, Jr., to the Trust Company of Georgia. The only liabilities which it had as of that date other than the note payable to the Trust Company of Georgia were accrued expenses of $311.66, the indebtedness to petitioner of $56,450, and an amount shown on its books as an indebtedness to Southeastern of $107,568.69. There is nothing in the record to indicate that the entire $145,119.96 of assets were not worth the full amount shown in the accounts. Of these assets, $9,918.67 consisted of cash, $32,770.09 of an indebtedness of W. Neal Irby to Irby & Co., and as stated above $59,026.52 of an indebtedness of A. F. Irby, Jr., to the company. The record shows these various assets remaining on the books of Irby & Co. as of December 31, 1960, with the capital stock owned by A. F. Irby, Jr., not being shown as cancelled. These facts indicate that creditors would have been able to obtain payment out of the assets which have not been shown to lack value. As a matter of law creditors would *251 be entitled to collect from these assets even though an agreement had been entered into between A. F. Irby, Jr. and Irby & Co. whereby the corporation was to purchase its stock held by A. F. Irby, Jr. The evidence in this case shows that as of December 31, 1959, the books of Irby & Co. showed a surplus of $20,839.69. The evidence shows that this surplus was arrived at without making a provision for bad debts as had been done in the audited balance sheet of Irby & Co. as of December 31, 1958, and by valuing at cost investments which the record shows had a value, at least to some extent, of less than cost as of December 31, 1959. Therefore, actually as of December 31, 1959, a correct balance sheet of Irby & Co. would show no surplus. Section 22-1828(d) of the Georgia Code[1] which is a part of the 1938 Corporation Act of Georgia provides that a corporation may buy its own shares only out of surplus of its assets over its liabilities including capital stock. It is therefore shown by the evidence that at the time of the agreement between Irby & Co. and A. F. Irby, Jr., for the purchase by Irby *252 & Co. of its stock held by A. F. Irby, Jr., that company was not, under Georgia law, entitled to purchase the stock of A. F. Irby, Jr., for any amount on the basis of a true analysis of surplus or for an amount in excess of $20,839.69 on the basis of the surplus figure shown on the unaudited balance sheet. There is nothing to show that at any subsequent date Irby & Co. had a sufficient surplus to purchase its stock, the indication from all other evidence in the record being that it did not. In Brooks-Pruitt Tire Co. v. Brooks & Zuker Tire Co., 199 Ga. 644, 16 S.E. 2d 423 (1941) the Court held that a payment by a person indebted to a corporation at the direction of that corporation on the corporation's purported indebtedness to a stockholder arising from a contract to purchase its stock made when the corporation lacked adequate surplus to purchase the stock was illegal and did not discharge the debt. Cf. Miller Service v. Miller, 45 S.E. 2d 466, 469-470 (Ga. Ct. App., 1947). See also Fitzpatrick v. McGregor, 133 Ga. 332, 65 S.E. 859 (1909), which discusses the rights of creditors against a stockholder who received assets from an insolvent corporation *253 in a purported sale of his stock to that corporation.
*254 Even if the agreement to purchase the stock of Irby & Co. held by A. F. Irby, Jr. were to be considered to have been made at a time when Irby & Co. did have surplus, the creditors of Irby & Co. would still have superior claims to the assets of that company over any claims of A. F. Irby, Jr., for payment to him by Irby & Co. for his stock. Since the sale was conditioned on payment by Irby & Co. of the note of A. F. Irby, Jr., to the Trust Co. of Georgia, there was no time during the year 1960 when it could be said that payment had been made to A. F. Irby, Jr., for his stock and his debt to Irby & Co. cancelled. The general law of corporations is that the time of an agreement by a stockholder to sell his stock to the corporation is not the controlling date, but the time of payment. The theory is that the capital of a corporation is a trust fund and the directors as trustees may not dispose of it to the prejudice of creditors, and no stockholder is entitled to any share of it until all of the debts are paid. Under this theory a stockholder who sells his shares to the issuing corporation with *255 payment deferred, assumes the risk that the corporation may not have sufficient surplus out of which to make payment when the payment becomes due. Kleinberg v. Schwartz, 87 N. J. Super. 216, 208 A. 2d 803 (1965). In that case the Court stated at page 808: * * * The authorities seem to be unanimous in holding that the fact that the corporation had a surplus when the agreement to purchase was made is not sufficient to defeat the rights of creditors of the corporation, if it does not have a surplus at the time the payments are actually made. Berger v. U.S. Steel Corporation, 63 N.J. Eq. 809, 817, 53 A. 68 (E. & A. 1902); Hoover Steel Ball Co. v. Schafer B. B. Co., 90 N.J. Eq. 164, 106 A. 471 (Ch. 1919); Boggs v. Fleming, 66 F. 2d 859 (4 Cir. 1933); Iback v. Electric Supp. Co., 118 N.J. Eq. 90, 177 A. 458 (Ch. 1935); Topken, Loring & Schwartz, Inc. v. Schwartz, 249 N.Y. 206, 163 N.E. 735 (N.Y. Ct. App. 1928); Robinson v. Wangemann, 75 F. 2d 756 (5 Cir. 1935); In re Bell Tone Records, Inc., 86 F. Supp. 806, 810 (D.C.N.J. 1949); Mountain State Steel Foundry, Inc. v. C.I.R., 284 F. 2d 737, 742 (4 Cir. 1960); *256 1 Cook on Corporations (7th ed.), par. 9. Robinson v. Wangemann, 75 F. 2d 756 (C.A. 5, 1935), one of the cases cited in Kleinberg v. Schwartz, supra, involved a situation in which a stockholder had sold some of his stock to the corporation at a time when the surplus of the corporation was sufficient to permit it to make the purchase and had taken a note of the corporation for the purchase price. Before the note, which was renewed, had been paid, the corporation became insolvent, and its assets were insufficient to pay creditors in full. The stockholder claimed, on the basis of the note, the right to share with other creditors in the distribution of the corporate assets. In holding that the stockholder was not entitled to any portion of the distribution of assets, the Court stated: * * * A transaction by which a corporation acquires its own stock from a stockholder for a sum of money is not really a sale. The corporation does not acquire anything of value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case. It is *257 simply a method of distributing a proportion of the assets to the stockholder. The assets of a corporation are the common pledge of its creditors, and stockholders are not entitled to receive any part of them unless creditors are paid in full. When such a transaction is had, regardless of the good faith of the parties, it is essential to its validity that there be sufficient surplus to retire the stock, without prejudice to creditors, at the time payment is made out of assets. In principle, the contract between Wangemann and the corporation was executory until the stock should be paid for in cash. It is immaterial that the corporation was solvent and had sufficient surplus to make payment when the agreement was entered into. It is necessary to a recovery that the corporation should be solvent and have sufficient surplus to prevent injury to creditors when the payment is actually made. This was an implied condition in the original note and the renewals accepted by Arthur Wangemann. The fact that one of the major assets from which petitioner might have collected the debt owed to it by Irby & Co. was an amount owed by its principal stockholder to Irby & Co. and another major source *258 for such a collection was an amount owed to Irby & Co. by W. Neal Irby, the brother of petitioner's principal stockholder, does not affect the legal power of petitioner to have made the collection. Nothing in this record indicates that either A. F. Irby, Jr., or W. Neal Irby was unable to pay the amounts which they owed to Irby & Co. had steps been taken to enforce the collection of such amounts. In 1961 either Irby & Co. or W. Neal Irby and A. F. Irby, Jr. did pay the indebtedness of A. F. Irby, Jr. to the Trust Company of Georgia. This indicates that A. F. Irby, Jr., and W. Neal Irby were each able to make payments in the approximate amount of $31,000 and there is nothing in the evidence to indicate that they were not able to make payments in excess of such amount. Petitioner is a corporation distinct from its shareholders. If it could collect the indebtedness of Irby & Co. to it from assets which consisted in large part of indebtednesses of A. F. Irby, Jr. and other members of the Irby family to Irby & Co., it is not entitled to charge off the debt as worthless if it fails to collect from this source because it chooses not to do so. [2] There is evidence that all the liabilities *259 of Irby & Co. other than amounts shown on its books as due to petitioner and another company the stock of which was owned by A. F. Irby, Jr., W. Neal Irby and their mother were paid in full. There is nothing to show why petitioner could not have collected its debt as did other creditors of Irby & Co. in 1960 if it had not been that in that year petitioner chose to forbear. Petitioner's abstention from vigorous collection activity was not an "arm's-length abstention," for it could have collected the debt if it had chosen to use the legal means available to it to do so. *260 We hold that petitioner is not entitled to the claimed bad debt deduction of $56,450 in 1960. Decision will be entered for respondent. Footnotes
*. Total Assets less Total Liabilities and Capital Stock.↩
*. This is a "Loan to Southeastern Life Managers (a wholly-owned subsidiary)."↩
*. This total differs by 1 cent from the figure shown on the balance sheet of Irby & Co. as of December 31, 1960.↩
*. Before deduction of claimed bad debt. ↩
**. The claimed bad debt deduction. ↩
***. Net operating loss carryback deduction.↩
1. Sec. 22-1828(d), Georgia Code. (d) Buy and sell its own stock. To purchase, hold, sell and transfer shares of its own capital stock: Provided, that no such corporation shall purchase its own shares of capital stock except from the surplus of its assets over its liabilities, including capital stock: Provided, further, that shares of capital stock shall be purchased only from earned surplus where there is outstanding another class of shares having a distribution preference over the shares purchased. Anything to the contrary notwithstanding, a corporation may in any event acquire its shares to collect or compromise in good faith a debt, claim or controversy against the corporation, or in settlement of a debt owing to the corporation where necessary to protect the corporation against loss, or to discharge an obligation of the corporation to a shareholder who has exercised the right of dissent from a proposed corporate merger or consolidation, as provided in this Chapter; or to discharge an obligation of the corporation to a shareholder who has exercised his right of conversion of shares pursuant to the charter. No shares subject to redemption at the option of the corporation shall be purchased at a price exceeding the redemption price thereof. Shares of its own capital stock held by the corporation shall not be voted directly or indirectly nor counted as outstanding for the purpose of any stockholders' quorum or vote, or dividends or distributions of any kind whatsoever. * * *↩
2. A. F. Irby testified as follows with respect to attempts to collect the indebtedness: I think that what I am going to say should be very evident from what has been said by a great number of people. I sold my stock in this company to my brother because it was the best thing to do. We had some disagreements, which is very obvious. Your Honor has already pointed out a moment ago that you had ninety days or a period of negotiated time by agreement to sell this business, and I kept persisting in the view that my brother would sell it, but here again I must say that vanity and the desire to perpetuate something that had the Irby name a long time led him to take another course. I am not in the least critical when I say that. I am simply being factual and I had every right to believe that sooner or later this company business would eventually be purchased by a company who had the ability to pay. The business was highly salable. It is a pity it wasn't done, but it wasn't done; that is water over the dam. I had every reason to believe that something of that nature would happen and could and when we finally got to the point where it didn't - I had nothing to do with the affairs of A. F. Irby & Company - he had every right to run it as he saw fit. Q. Did Irbco attempt to collect the $56,000? A. We were told you can't get blood out of a turnip. We asked for money. We had every right to expect the business could be sold and we would get our money. Q. If you knew your brother was indebted to A. F. Irby & Company for over $300,000 - A. That my brother was indebted? Q. Yes. A. I had no personal knowledge. I had no statements of A. F. Irby. I was not a stockholder. I had no right to ask for it. Q. Did you attempt to find out what assets the corporation had? A. I did, but it was quite obvious after having been connected with this business for nearly thirty years that if this business was not sold to the company it was insolvent. That was as clear as black and white. Q. Basically you made no attempt to ascertain the assets of the corporation? A. I made every reasonable attempt, but I have got my brother and family. I am perfectly willing to stand on the facts as I saw them. I didn't intend to hire a collection attorney. I was going to handle it in a gentlemanly, proper fashion.↩