Southeastern Aviation Underwriters, Inc. v. Commissioner.
Southeastern Aviation Underwriters, Inc. v. Commissioner
Docket No. 5366-63.
United States Tax Court
T.C. Memo 1966-75; 1966 Tax Ct. Memo LEXIS 207; 25 T.C.M. (CCH) 412; T.C.M. (RIA) 66075; April 11, 1966
DeJongh Franklin and David J. Harris, Suite 509, Standard Federal Bldg., Atlanta, Ga., for the petitioner. Arthur P. Tranakos and George W. Calvert, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1957, 1958, 1959, and 1960 in the respective amounts of $18,084.55, $25,585.81, $33,539.60, and $31,168.71. The issue for decision is whether petitioner sustained a net operating loss in the year 1960 resulting *209 from a deduction, as an ordinary and necessary business expense, of a loss incurred on the sale of common stock of Bankers Fire and Marine Insurance Company and from a deduction for a bad debt of unrepaid portions of amounts advanced to a related corporation. The deficiencies for the years 1957, 1958, and 1959 result entirely from the disallowance of net operating loss carrybacks previously tentatively allowed. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, a corporation organized under the laws of the State of Georgia in 1947, filed its corporate Federal income tax returns for the calendar years 1957, 1958, 1959, and 1960 with the district director of internal revenue, Atlanta, Georgia. For each of these years petitioner kept its books and filed its returns on an accrual basis of accounting. Petitioner was organized for the primary purpose of acting as an agent and representing insurers or underwriters in connection with insurance coverage on aircraft hulls, aircraft liability and airport liability insurance, and the undertaking of underwriter powers delegated to it by such insurers or underwriters. In addition petitioner wrote *210 accident and health insurance. Petitioner's mode of operation and main function was to act as an aviation insurance manager for an established insurance company. In order to operate as an aviation insurance manager, a formal agreement with an established insurance company, outlining specifically petitioner's duties, responsibilities, and participation was necessary. During the years 1958 through 1961, petitioner's outstanding stock consisted of three shares of $100 par value. One of these shares was owned by A. F. Irby, Jr., one by W. Neal Irby, and one by Daisy N. Irby, the mother of A. F. Irby, Jr., and W. Neal Irby. Prior to the death of A. F. Irby, Sr., on December 27, 1957, he had owned the share owned by his widow, Daisy N. Irby during 1958 through 1961. During 1956 and 1957, A. F. Irby, Jr., was president of petitioner and W. Neal Irby was vice president and secretary. W. Neal Irby, during these years, was responsible for the day-to-day operation of petitioner's business. During all of 1960 W. Neal Irby was president of petitioner. Upon petitioner's organization in 1947, it obtained an aviation insurance management contract with the Ohio Casualty Insurance Company which *211 contract was in effect through April 30, 1948. From May 1, 1948, through January 31, 1949, petitioner had such a contract with Bankers Fire and Marine Insurance Company (hereinafter referred to as Bankers), and commencing February 1, 1949, petitioner had an aviation insurance management contract with the underwriters at Lloyd's, London, Petitioner operated under the contract with Lloyd's, London, until June 30, 1957. In the latter part of 1956, representatives of Lloyd's, London, informally notified petitioner's officers that Lloyd's would not renew the aviation insurance management contract with petitioner when it expired on June 30, 1957. Formal notification of the termination of the contract by Lloyd's, London, was received by petitioner in January 1957. Between the time, in the latter part of 1956, of informal notification of the proposed cancellation by Lloyd's, London, of petitioner's contract and formal notification of such cancellation in January 1957, petitioner negotiated with representatives of Lloyd's, London, to have the contract continued. A new contract with Lloyd's, London, containing different terms and conditions from the one under which petitioner was operating, *212 was offered to petitioner but Lloyd's, London, would not agree to continue a contract with the same terms and conditions as the one under which petitioner was then operating. The new agreement proposed by Lloyd's, London, would have reduced petitioner's authority to bind the company in some instances by as much as 96 percent and other types of liability coverage written under the contract under which petitioner was then operating were excluded altogether in the proposed contract. Most basic liability coverage was reduced by at least 50 percent of comparable coverages under the existing agreement. Commissions payable to petitioner under the new agreement proposed by Lloyd's, London, were to be reduced from 30 percent of the premiums collected to 20 percent of such amount, and contingent commissions based on the underwriting profit from the aviation insurance business produced were to be reduced from 20 percent to 15 percent. Under the proposed new agreement, petitioner's delegated authority and jurisdiction to settle losses incurred in connection with the aviation insurance business it produced was to be limited to $10,000 per claim, as compared to a $30,000 per claim limit under the *213 contract under which petitioner was then operating. Petitioner could not have operated under the new contract proposed by Lloyd's, London, on the same basis as it had operated under the old contract in that its authority to handle claims, name rates, and generally have the freedom to manage its operation would have been curtailed under the terms of the proposed new contract. After petitioner received informal notification of the proposed termination of its contract with Lloyd's, London, W. Neal Irby contacted, on behalf of petitioner, representatives of Bankers with a view to obtaining an aviation insurance management contract from that company, but that company would not agree to such a contract with petitioner. The reasons given by the representatives of Bankers to W. Neal Irby for refusing to enter into a contract with petitioner were that they preferred that the company remain in the simpler form of insurance business and that reinsurers objected to Bankers' going into the aviation insurance business. W. Neal Irby, after the informal notification of cancellation was received by petitioner from Lloyd's, London, also contacted several persons who were underwriting managers. *214 One of the persons he contacted was located in Montreal, Canada, one in Philadelphia, Pennsylvania, one in Atlanta, Georgia, and one in New York, New York. He made inquiries of these persons to ascertain whether they could suggest an insurance company with which petitioner might obtain an aviation insurance management contract. His inquiries did not result in his receiving any suggestions as to a company that might enter into such a contract with petitioner. W. Neal Irby had been in the insurance business for many years and was familiar with the fact that there were a number of companies in the United States writing aviation insurance, but because of the general situation in the aviation insurance business in the latter part of 1956, he believed he would be able to obtain a favorable aviation insurance management contract only by finding a company not currently in the aviation insurance business but which was willing to go into such business. Petitioner, through the contacts and negotiations carried on by W. Neal Irby, did not find an insurance company willing to enter into an aviation insurance management agreement with petitioner. From sometime in the early 1950's, A. F. Irby, *215 Jr., had been on the Board of Directors of Bankers. O. Z. Hall had also been on the Board of Bankers from the early 1950's. O. Z. Hall's primary business was as an automobile dealer, and not the insurance business. The person who had been primarily responsible for the operation of Bankers had become seriously ill in 1956, and in September 1956, O. Z. Hall became president of Bankers. O. Z. Hall was also a major stockholder in Bankers and was considering converting Bankers into an automobile financing company. Certain of the other directors of Bankers did not agree with O. Z. Hall that the company should be converted into an automobile financing company and they discussed the matter with A. F. Irby, Jr. After these discussions A. F. Irby, Jr., became interested in acquiring a sufficient amount of stock in Bankers in order to have sufficient control of the company to cause it to enter into a favorable aviation insurance management contract with petitioner. Following the initial discussion between A. F. Irby, Jr., and O. Z. Hall with respect to the purchase by the Irbys of Bankers' stock and having Bankers enter into an aviation insurance management contract with petitioner, W. Neal *216 Irby also began to participate in the negotiation. On December 27, 1956, A. F. Irby, Jr., entered into an agreement with O. Z. Hall whereby A. F. Irby, Jr., personally contracted to purchase from O. Z. Hall 17,500 shares of Bankers stock for $20 per share or a total of $350,000. A. F. Irby, Jr., discussed with W. Neal Irby and with their father, the fact that he should not personally assume the obligation of purchasing the Bankers' stock when the benefit from the ownership of the stock would go to petitioner in that it would be able to obtain an aviation insurance management contract with Bankers. Following these discussions, A. F. Irby, Jr., on January 27, 1957, assigned his rights under his contract dated December 27, 1956, to petitioner and Irbco Corporation (hereinafter referred to as Irbco). Irbco is a Georgia corporation, incorporated on October 11, 1954, for the purpose of buying, holding, owning, improving, renting, and selling both real and personal property and performing all acts incidental thereto. At the date of its incorporation, its outstanding stock consisted of 12 shares of $100 par value common stock, 4 of which were owned by A. F. Irby, Sr., the father of A. *217 F. Irby, Jr., and W. Neal Irby; 4 by A. F. Irby, Jr.; and 4 by W. Neal Irby. After the death of A. F. Irby, Sr., his 4 shares of stock were owned by his estate. A. F. Irby, Jr., and W. Neal Irby each continued to own 4 shares. On August 30, 1960, the shares held by the estate of A. F. Irby, Sr., were distributed to Daisy N. Irby, his widow, pursuant to the terms of the last will and testament of A. F. Irby, Sr., and early in 1961 A. F. Irby, Jr., purchased the stock of W. Neal Irby for $1. A. F. Irby, Jr., was president of Irbco in 1956 and 1957, and during these years and until the date of the sale of his stock to A. F. Irby, Jr., W. Neal Irby was vice president and secretary of Irbco. Irbco owned an office building located at 1829-1847 Peachtree Road in Atlanta, Georgia, which prior to 1960 was leased to three tenants, the major one of which was A. F. Irby & Company, Inc. (hereinafter referred to as Irby & Co.). Petitioner was a sublessee of Irby & Co. without a formal sublease between petitioner and Irby & Co. Petitioner paid a rental to Irby & Co. of $100 per month and a portion of the telephone and other miscellaneous expenses. Irby & Co. was incorporated under the laws *218 of the State of Georgia in 1947, and from the date of its incorporation until early in 1960 was engaged in the insurance brokerage business, acting as general agent for insurance companies in the southeastern part of the United States. At its incorporation in November 1947 the capital stock of Irby & Co. consisted of 100 shares of no par common stock, 51 shares of which were issued to A. F. Irby Sr., and 49 shares to A. F. Irby, Jr. On November 30, 1950, the capitalization of Irby & Co. was increased to 1,000 shares no par common stock, and an additional 459 shares were issued to A. F. Irby, Sr., and 441 shares to A. F. Irby, Jr. In 1957 W. Neal Irby became the owner of 200 shares of the common stock of Irby & Co. through gifts of 110 shares from his father and 90 shares from his brother, A. F. Irby, Jr. After making these gifts, A. F. Irby, Sr., and A. F. Irby, Jr., each owned 400 shares of the stock of Irby & Co., and W. Neal Irby owned 200 shares. According to the will of A. F. Irby, Sr., his 400 shares of stock were bequeathed to Irby & Co. In January 1958, A. F. Irby, Jr., transferred 40 shares of his stock in Irby & Co. to W. Neal Irby, leaving him with 360 shares and increasing *219 the shares of W. Neal Irby to 240. At that time 400 shares of the stock of Irby & Co. were held by the estate of A. F. Irby, Sr. Subsequent to the assignment by A. F. Irby, Jr., of his agreement dated December 27, 1956, to purchase stock of O. Z. Hall in Bankers to petitioner and Irbco, representatives of these companies negotiated with O. Z. Hall, and as a result of these negotiations, a contract was entered into on July 30, 1957, between O. Z. Hall as president of Bankers and petitioner and Irbco under which petitioner and Irbco jointly and severally agreed to purchase over a period extending through December 31, 1960, 65,700 shares of Bankers' common stock, which represented over 45 percent of the outstanding common stock of Bankers. Under this agreement 17,500 shares of Bankers' stock were to be initially purchased by petitioner and Irbco from O. Z. Hall for $18.50 per share or a total of $323,750. Also under the agreement, petitioner and Irbco purchased 30,000 shares of Bankers' stock directly from the company for $30 per share, such purchase being made on or about August 31, 1957. Petitioner and Irbco financed their purchases of Bankers' stock through a bank loan in an original *220 amount of approximately $647,117.84 obtained from the Florida National Bank of Jacksonville, Florida. This loan was evidenced by a promissory note to the Florida National Bank made jointly and severally by Irbco and petitioner, endorsed by A. F. Irby, Jr., and W. Neal Irby, personally, and secured by a pledge of 48,200 shares of Bankers' stock. As of July 30, 1957, petitioner and Irbco had either purchased, agreed to purchase, or obtained through stock dividends, common stock in Bankers representing approximately one-third of the outstanding stock of that company and as of December 31, 1957, petitioner and Irbco had either purchased, agreed to purchase, or obtained through a stock dividend, stock in Bankers representing approximately 47 percent of the outstanding stock of that company. Petitioner on the balance sheets contained in its books and records listed the Bankers' stock it had purchased under "Investments." After petitioner had agreed to purchase stock of Bankers, an aviation insurance management agreement was consummated between petitioner and Bankers commencing July 1, 1957, the termination date of petitioner's agreement with Lloyd's, London. The agreement between petitioner *221 and Bankers remained in force from July 1, 1957, until October 31, 1960. The following shows petitioner's total premiums on aviation insurance written by it under the contracts with the insurers indicated for the periods indicated: Amount of
Company
Period
premiums
Ohio Casualty Ins. Co.
Jan. 1, 1947 through Dec. 31, 1947
$262,237.17
Ohio Casualty Ins. Co.
Jan. 1, 1948 through April 30, 1948
9,952.48
Bankers Fire & Marine Ins. Co.
May 1, 1948 through Dec. 31, 1948
87,226.48
Lloyd's, London
Feb. 1, 1949 through December 31, 1949
55,065.21
Lloyd's, London
Jan. 1, 1950 through December 31, 1950
89,706.73
Lloyd's, London
Jan. 1, 1951 through December 31, 1951
45,020.78
Lloyd's, London
Jan. 1, 1952 through December 31, 1952
15,543.27
Lloyd's, London
Jan. 1, 1953 through December 31, 1953
42,932.18
Lloyd's, London
Jan. 1, 1954 through December 31, 1954
139,091.23
Lloyd's, London
Jan. 1, 1955 through December 31, 1955
102,366.77
Lloyd's, London
Jan. 1, 1956 through December 31, 1956
76,757.46
Lloyd's, London
Jan. 1, 1957 through June 30, 1957
61,631.46
Bankers Fire and Marine Ins. Co.
July 1, 1957 through December 31,1957
89,346.04
Bankers Fire and Marine Ins. Co.
Jan. 1, 1958 through December 31,1958
300,583.67
Bankers Fire and Marine Ins. Co.
Jan. 1, 1959 through December 31,1959
403,436.70
Bankers Fire and Marine Ins. Co.
Jan. 1, 1960 through October 31, 1960
395,015.00
Houston Fire and Casualty Ins. Co.
Nov. 1, 1960 through December 31, 1960
106,686.73
Houston Fire and Casualty Ins. Co.
Jan. 1, 1961 through October 31, 1961
473,529.97
General Guaranty Ins. Co.
Nov. 1, 1961 through December 31, 1961
82,679.45
General Guaranty Ins. Co.
Jan. 1, 1962 through July 31, 1962
309,572.31
*222 In the year 1956 petitioner's accident and health insurance business represented approximately 25 percent of its total commission income. Accident and health insurance business is considered in the insurance industry as a low commission business. Of the aviation insurance written by petitioner under its agreement with Bankers, that company retained 10 percent of the first $100,000 of liability as its own coverage and reinsured all amounts in excess of such 10 percent. Because of a decline in the market value of Bankers' stock, petitioner, at the insistence of the First National Bank of Florida to whom the Bankers' stock was pledged as collateral, was required to sell its controlling stock in Bankers in February 1960 for $3.50 per share. As a result of the sale of 50,700 shares of Bankers' common stock, owned jointly by petitioner and Irbco, a loss was incurred in the amount of $496,300. At the time of the sale of the 50,700 shares of Bankers' stock by petitioner and Irbco, there still remained an obligation on these corporations to purchase 12,000 additional shares of the common stock of Bankers from O. Z. Hall at $20 per share. At the request of petitioner and Irbco, O. Z. Hall *223 sold these 12,000 shares of common stock of Bankers at $3.50 per share to the same person to whom petitioner and Irbco sold their Bankers' stock with the understanding that petitioner and Irbco would reimburse O. Z. Hall for the difference between the $20 per share agreed upon as the price of the common stock of Bankers and the $3.50 per share sales price. This difference amounted to $198,000. Petitioner, on July 21, 1960, agreed to pay the full amount of the $198,000 to O. Z. Hall which was required to be paid under the agreement of O. Z. Hall with petitioner and Irbco. No payments on the $198,000 indebtedness to O. Z. Hall were ever made by Irbco. The full amount of this obligation was paid by assignment to O. Z. Hall of amounts owed to petitioner by a third party and payments made by petitioner. Petitioner made the final payment on this obligation in 1963. Bankers, prior to the expiration date of its aviation insurance management contract with petitioner on October 31, 1960, and subsequent to the sale by petitioner and Irbco of their Bankers' stock, informed petitioner that its aviation insurance management contract with Bankers would be terminated. As of the end of 1956 there *224 were 28 insurance companies listed in the Agents' and Buyers' Guide as engaged in aviation insurance business in the United States. Other than Lloyd's, London, petitioner did not directly contact any of these companies with respect to an aviation insurance management contract. In November 1958, Irby & Co. purchased 2,500 shares of the common stock of Bankers and on June 11, 1959, purchased 500 shares of Bankers' common stock from O. Z. Hall. These purchases were made by Irby & Co. for $20 per share in order to relieve petitioner and Irbco from the responsibility of making the purchases at that time. Between February 29, 1959, and February 5, 1960, petitioner advanced to Irby & Co. the following amounts on the dates shown: Date
Amount
February 29, 1959
$ 50,000.00
April 30, 1959
14,000.00
April 30, 1959
26,767.17
June 30, 1959
7,000.00
September 10, 1959
21,800.00
November 3, 1959
7,000.00
January 26, 1960
13,350.00
January 26, 1960
22,650.00
February 5, 1960
3,500.00
$166,067.17
Irby & Co., between July 9, 1959, and October 31, 1960, repaid petitioner a portion of the advances in the amounts and on the dates indicated: Date
Amount
July 9, 1959
$ 5,000.00
July 23, 1959
5,000.00
October 26, 1959
10,000.00
October 30, 1959
10,000.00
March 31, 1959
12,595.26
June 24, 1959
15,171.91
July 20, 1960
232.73
October 31, 1960
148.58
$58,148.48
*225 Irby & Co., as of February 1960, had approximately 43,981 shares of Bankers' stock. Twenty thousand shares of preferred stock had been purchased by Irby & Co. directly from Bankers in 1958, and in 1959 converted into 40,000 shares of common stock. The other shares consisted of the purchases in November 1958 and June 1959 previously referred to, some shares received as stock dividends, a few shares which had been purchased by A. F. Irby, Sr., some years prior to his death and transferred by him in April 1957 to Irby & Co., and some shares which had been owned by A. F. Irby, Sr., at the date of his death and transferred on December 30, 1959, to Irby & Co.
In order to make its purchases of Bankers' stock Irby & Co. secured a loan of approximately $195,000 from the First National Bank of Atlanta, Georgia, for which a promissory note was executed by Irby & Co. and personally endorsed by A. F. Irby, Jr., and W. Neal. Irby. The note was secured by a pledge of approximately 20,000 shares of the preferred stock of Bankers. On the same day on which petitioner and Irbco sold their common stock of Bankers, Irby & Co. sold its 43,981 shares to the same individual at $3.50 per share. During *226 the year 1959 Irby & Co. was continuously in need of cash to pay its accounts payable to the insurance companies it represented while still awaiting collection of its accounts receivable from its agents. During this time Irby & Co. had outstanding accounts receivable from its agents ranging up to approximately $2,000,000.00. Irby & Co. had an informal agreement with the Trust Company of Georgia from sometime early in 1959, which about mid-1959 was reduced to a written agreement, providing that it could borrow on its accounts receivable up to $250,000 in any month from the Trust Company of Georgia. Irby & Co. did, in fact, borrow during each month in 1959 funds from the Trust Company of Georgia against its accounts receivable with which to pay its accounts to the various insurance companies which it represented. In January 1960, Irby & Co. borrowed funds from the Trust Company of Georgia pursuant to its agreement with that bank, and early in February 1960 when this loan was repaid, the representatives of the Trust Company of Georgia informed representatives of Irby & Co. that no further sums would be advanced by the bank to Irby & Co. on its accounts receivable. The Trust Company *227 of Georgia cancelled its agreement with Irby & Co. to advance funds on accounts receivable and did not lend any such funds to Irby & Co. after January 1960. The audited balance sheet of Irby & Co. as of December 31, 1958, showed the following assets and liabilities: ASSETS
Current Assets: Balances in Banks (Schedule 1)
1. Checking Accounts
$ 74,557.24
2. Savings Accounts
29,407.88
$ 103,965.12
Petty Cash
100.00
Accounts Receivable - Agents
2,326,732.31
Less - Reserve for Bad Debts
24,163.49
2,302,568.82
Loss Payment Recoverable
14,862.35
Less - Reserve for Bad Debts
6,485.43
8,376.92
Sundry Accounts Receivable
4,447.72
Loans to Employees
4,552.50
Southeastern Life Managers, Inc.
17,291.10
Cash Value of Life Insurance
28,621.55
Investments (Schedule II) Cost
190,611.26
Market Value
148,945.90
Tax Anticipation Notes
6,000.00
Accrued Commissions
549.36
Accrued Dividends
124.00
Total Current Assets
$2,625,542.99
Fixed Assets: Furniture and Fixtures
120,681.96
Automobiles
5,223.31
Building Alterations
117,799.31
243,704.58
Less - Reserve for Depreciation
91,519.29
Total Fixed Assets
$ 152,185.29
Personal Accounts of Officers: A. F. Irby, Jr.
38,203.39
W. Neal Irby
136.04
Daisy Neal Irby
5,013.80
Total Personal Accounts
43,353.23
TOTAL ASSETS
$2,821,081.51
LIABILITIES
Liabilities
Accounts Payable -
Companies
$1,838,361.93
Reinsurance
126,149.30
Sundry Accounts
9,944.04
$1,974,455.27
Accrued Accounts Payable -
Companies
222,886.10
Other
291.36
223,177.46
Sundry Taxes Payable
16,909.95
Employees Welfare Fund
127.96
Accrued Agents' Commissions
6,195.13
Accrued Expenses
28,070.95
A. F. Irby & Company, Inc.
.00
Irbco Corporation
98,823.16
Southeastern Aviation Underwriters, Inc.
50,000.00
Notes Payable
249,082.37
Provision for Income Taxes -
Georgia
5,000.00
Federal
56,000.00
61,000.00
TOTAL LIABILITIES
$2,707,842.25
Capital
46,257.47
Surplus
66,981.79
113,239.26
$2,821,081.51
*228 The unaudited balance sheet as reflected on the books of Irby & Co. as of December 31, 1958, and December 31, 1959, showed the following: ASSETS
1959
1958
Current Assets: Bank Accounts
$ 89,914.34
$ 78,042.67
Payroll Account
3,000.00
3,000.00
Savings Accounts
6,719.30
29,407.88
Petty Cash
100.00
100.00
Accounts Receivable -
Agents Balance
1,401,698.25
2,326,732.31
Thomas F. Gerdine
4,500.00
6,000.00
Liberty Life Ins. Co.
2,291.48
S. E. Aviation Und.
225.65
S. E. Life Mgrs.
5.30 Cr.
Notes Receivable -
Phillips Ins. Agency
9,585.88
Loans -
A. F. Irby, Jr.
$ 7,256.67
W. N. Irby
$ 32,999.99
8,541.66
Cy Avery
500.00
R. I. Barge, Jr.
496.80
Eleanor C. Barry
132.50
A. M. Hunter
2,000.00
2,000.00
J. E. McKain
1,320.00
2,420.00
Southeastern Life Mgrs.
23,132.66
17,291.10
Cash Surrender Value Life Insurance
26,836.07
27,217.75
Accrued Comm. Earned
549.36
Accrued Dividends & Interest Received
124.00
Miscellaneous Voucher Account
3,232.58
2,156.24
Loss Payments -
Arbon Langrish
10,757.90
5,759.71 Cr.
C. T. Bowring
4,946.31
Christiania General
390.01
Employers Surplus
9,481.79 Cr.
Gardner, Mountain
947.55
L. Hammond
7,994.34
8,142.32
Lukis, Stewart
2,276.80
5,166.65 Cr.
Reinsurance Corp.
5,440.91
9,493.34
Smith, Biggs
330.06
W. K. Stringer & Co.
75.00
Towers, Perrin, Forster
8.50
Investments
301,053.43
190,611.26
A. F. Irby, Jr. Personal a/c
28,027.05
A. F. Irby, Jr. Income Tax a/c
3,506.67
Mrs. Daisy Neal Irby, Personal a/c
4,052.47
5,013.80
W. N. Irby, Personal a/c
4,997.60 Cr.
3,995.44 Cr.
W. N. Irby, Personal Income Tax a/c
3,476.87
4,572.68 Cr.
TOTAL CURRENT ASSETS
$1,931,860.39
$2,740,231.20
Fixed Assets: Automobiles
$ 48,596.03
$ 5,223.31
Reserve for Depreciation
10,546.68 Cr.
$ 38,049.35
2,580.85 Cr.
$ 2,542.46
Furniture & Fixtures
123,926.12
120,681.96
Reserve for Depreciation
78,116.58 Cr.
45,809.54
68,923.77 Cr.
51,758.19
Building Alterations
117,799.31
117,799.31
Reserve for Depreciation
32,383.91 Cr.
85,415.40
20,014.67 Cr.
97,784.64
DEFERRED DEBITS
122,320.92
TOTAL ASSETS
$2,223,455.60
$2,892,418.49
LIABILITIES
Current Liabilities: Premium Differences
$ 12,968.27
Accounts Payable -
Company Balances
$1,478,685.10
2,187,397.33
Nat'l Cash Register
3,346.30
S. E. Mdse Mart
2,222.24
Irbco Corp.
63,000.00
100,000.00
S. E. Aviation Und.
68,800.00
50,000.00
Accrued Accounts Payable - Other
291.36
Accrued Agency Comm. Paid
1,591.77
6,195.13
Notes Payable
$ 524,132.37
$ 254,977.50
Employees Welfare Fund
20.10 Cr.
127.96
Bowaters C. S. Fee Acct.
2,990.85
Florida C. S. Fee Acct.
217.94
204.95
Social Security Payable
234.00 Cr.
Withholding Tax Payable
1,664.90 Cr.
Employees Insurance Payable
767.41
1,179.70
Ala. U.C. Payable
.91
11.16
Ala. Income Tax Payable
46.28
51.11
N. C. Fireman's Pension Fund
.89
Lloyds State Tax Payable
15,559.53
18,049.65
Lloyds Federal Tax Payable
289.33 Cr.
4,543.62
Underwriters Return Tax
3,847.58 Cr.
Tax Anticipation Note Acct.
5,960.22 Cr.
Accrued Expenses Payable
3,866.56
28,070.95
TOTAL CURRENT LIABILITIES
$2,156,358.44
$2,660,922.27
CAPITAL STOCK: Authorized 1,000 Shares No Par Value Stock 1/1/48
1,000 Shares Issued
$ 46,257.47
$ 46,257.47
SURPLUS:
20,839.69
185,236.75
Total Liabilities & Net Worth:
$2,223,455.60
$2,892,416.49
*229 On the balance sheet on the books and records of Irby & Co., as of December 31, 1959, there appears next to "accounts receivable" a handwritten notation, "$40,000 uncollectible," and next to "investments" handwritten in parentheses, "196,000.00." On February 16, 1960, Irby & Co. advised the insurance companies it represented that it was unable to pay its November 1959 balances, thereby entitling the insurance companies, pursuant to the agency agreements, to immediately terminate their relationships with Irby & Co. A meeting was held in New York in February 1960 of representatives of Irby & Co. and representatives of the insurance companies with which Irby & Co. had agreements and at that meeting the insurance companies agreed to give forbearance to Irby & Co. and to help it straighten out its financial affairs and remain on a current basis with the insurance companies. In March 1960 the insurance business of Irby & Co. was transferred to Kinnett, Edwards & Boyd, a company not affiliated with Irby & Co. All of the insurance business including the accounts receivable from agents was so transferred and the accounts payable to insurance companies were taken over by the transferee. *230 The only consideration paid to Irby & Co. for the transfer was the agreement of Kinnett, Edwards & Boyd to use the accounts receivable transferred to it and part of the renewal premiums to pay off outstanding balances due by Irby & Co. to the insurance companies. After the transfer of its insurance business to Kinnett, Edwards & Boyd, Irby & Co. no longer engaged in the conduct of an insurance business. At the meeting of the executive committee of Irby & Co. on November 13, 1959, W. Neal Irby was authorized to negotiate on behalf of Irby & Co. to purchase from A. F. Irby, Jr., the stock he held in Irby & Co. The consideration which W. Neal Irby was authorized to pay for the stock of Irby & Co., held by A. F. Irby, Jr., was an assumption by the corporation of A. F. Irby, Jr.'s indebtedness to the Trust Company of Georgia, evidenced by a note in the principal amount of $63,294.39 with the understanding that the collateral of A. F. Irby, Jr., would remain as security for the indebtedness until the note was paid at which time it would be returned to A. F. Irby, Jr., and the cancellation of indebtedness of A. F. Irby, Jr., to Irby & Co. in the total amount of $59,026.53 as shown by a *231 number of accounts on the books of Irby & Co. Sometime subsequent to November 13, 1959, an agreement was entered into between A. F. Irby, Jr., and Irby & Co., whereby Irby & Co. agreed to purchase its stock held by A. F. Irby, Jr. On November 25, 1958, Irbco advanced to Irby & Co. the sum of $100,000, which amount was entered on the books of Irbco under "Accounts Receivable - A. F. Irby & Co., Inc." and designated, "Loan to Irby," and was entered on the books of Irby & Co. under "Accounts Payable - Irbco Corp." and designated, "Loan fr. Irbco Corp." On June 13, 1960, Irbco made an additional advance to Irby & Co. of $350. During 1959 and 1960 Irby & Co. made total repayments to Irbco on these advances in the amount of $43,900, leaving an unpaid balance as of December 31, 1960, of $56,450. The item appearing on the balance sheet of Irby & Co. as an asset as of December 31, 1959, in the amount of $122,320.92 under the designation "Deferred Debits" was composed of items which had appeared previously on petitioner's books as due from A. F. Irby, Jr., under the following designations in the amounts indicated: A. F. Irby, Jr.
Sales Account
$16,976.68
A. F. Irby, Jr.
Personal Account
34,648.17
A. F. Irby, Jr.
Personal Income
Tax Account
2,686.67
A. F. Irby, Jr.
Loan Account
4,715.01
*232 plus the amount of $63,294.39 which represented the personal indebtedness of A. F. Irby, Jr., to the Trust Company of Georgia which was to be assumed by Irby & Co. as partial payment for its stock held by A. F. Irby, Jr. A balance sheet prepared from the books and records of Irby & Co. listing assets and liabilities as of December 31, 1960, showed the following, after elimination of such assets as were transferred to the custodian account of Kinnett, Edwards & Boyd and the liabilities assumed by that company: ASSETS
Cash
$ 9,918.67
Officers & Employees: Wm. Neal Irby
32,770.09
H. R. Seawell, Jr.
500.00
J. E. McKain
220.00
Affiliates
20,853.63
(Loan to Southeastern Life Mana-
ger a wholly-owned subsidiary)
Cash surrender value of life insurance
1,820.71
Investments
Ga. Casualty & Surety Co.
2,460.00
Southern Airways
2,250.00
Southern Life Managers
200.00
Southern Merchandise Mart
10,000.00
A. F. Irby, Jr. and Mrs. Daisy N. Irby
5,100.34
(Payment of personal expenses)
Deferred debits
122,320.91
(Except for a one cent adjustment
in the personal account of A. F.
Irby, Jr., this is composed of
the same items as the deferred
debits appearing on the Decem-
ber 31, 1959 balance sheet of
Irby & Co.)
Total
$208,414.35
LIABILITIES
Accounts payable
Affiliates: Southeastern Aviation Underwriters
$107,568.69
Irbco, Inc.
56,450.00
Notes payable
63,294.39
(Loan of A. F. Irby, Jr., from the
Trust Co. of Georgia assumed)
Accrued expenses payable
311.66
Capital stock
46,257.47
Total
$273,882.21
*233 All debts of Irby & Co., other than advances to the company from petitioner and Irbco, were paid or were discharged by some agreement that the creditors would take as satisfaction in full of the obligation less than the full amount of the debt. To make these payments, Irby & Co. liquidated assets including automobiles, furniture, fixtures, and cash surrender value of life insurance policies which had been taken out when the company had borrowed money from lending institutions. Generally speaking, all of these obligations were paid with funds of Irby & Co., although W. Neal Irby made some small payments not in excess of $2,000 out of his own funds to some tradesmen he thought had been taken advantage of. The accounts payable to insurance companies were paid by Kinnett, Edwards & Boyd in accordance with their agreement with Irby & Co. when they took over its insurance business, the final payment, except for a disputed claim paid in 1963, being made on November 27, 1961. There were loans to Irby & Co. from the First National Bank of Atlanta which were endorsed by W. Neal Irby and A. F. Irby, Jr., as individuals which were paid off from assets of Irby & Co. In 1959 when the financial *234 condition of Irby & Co. was deteriorating, the First National Bank required that collateral be placed with it to secure these loans and Irby & Co. assigned certain life insurance policies it owned and gave a mortgage on furniture and fixtures as collateral on the loan. Petitioner did not receive a promissory note to evidence its advances to Irby & Co., and such advances bore no interest, and no collateral was given to secure the advances. On its Federal income tax return for the calendar year 1960 petitioner claimed an ordinary business loss of $446,150, resulting from its sale of its Bankers' stock and its agreement with respect to the 12,000 shares of such stock which it and Irbco remained obligated to purchase from O. Z. Hall, and claimed a bad debt deduction in the amount of $107,918.69, resulting from its advances to Irby & Co. Petitioner also claimed other bad debt deductions which are not now in controversy in this case. The total deductions claimed by petitioner on its return were in excess of its gross income resulting in a claimed net operating loss by petitioner in the amount of $498,221.25. Petitioner claimed net operating loss carrybacks to its taxable years 1957, 1958, *235 and 1959 which resulted in tentative allowances of $18,084.55, $25,585.81, and $33,539.60, respectively, for those years. Respondent in his notice of deficiency determined that petitioner sustained a capital loss on the sale of its Bankers' stock in the amount of $347,150, the reduction from the amount of loss shown by petitioner of $446,150 being one-half of the $198,000 ($99,000) which was the joint obligation of petitioner and Irbco to O. Z. Hall with respect to the 12,000 shares of Bankers' stock which had not been purchased at the date petitioner and Irbco sold all their Bankers' stock. Respondent also disallowed the bad debt deduction in the amount of $107,918.69 claimed by petitioner because of the advances made to Irby & Co. which had not been repaid as of December 31, 1960, with the explanation that petitioner had not established that it was entitled to a deduction in 1960 for this amount charged off as a bad debt. Opinion Section 165(a) of the Internal Revenue Code of 1954 provides that there shall be allowed as a deduction any loss sustained by a taxpayer *236 during the taxable year not compensated for by insurance or otherwise. Section 165(f) provides that losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. Section 1211 provides that in the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gain from such sales or exchanges. Section 1212 provides that the carryover by a corporation of net capital losses shall be allowed as a short-term capital loss in each of the 5 succeeding taxable years to the extent that such amount exceeds the total of any net capital gains of any taxable years intervening between the taxable year in which the net capital loss arises and such succeeding taxable year. Section 1221 defines capital assets as property held by the taxpayer (whether or not connected with his trade or business) with the exception of stock in trade, property held primarily for sale to customers in the ordinary course of the *237 taxpayer's trade or business, property used by a taxpayer in his trade or business of a character which is subject to the allowance for depreciation, or real property used in his trade or business, copyrights, literary, musical, or artistic compositions, accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property which is stock in trade or held primarily for sale to customers, or certain specified obligations of the United States or its possessions. Reading this definition literally would require the conclusion that the Bankers' stock sold by petitioner in 1960 was a capital asset and that the loss incurred was a loss resulting from the sale of a capital asset and thus deductible only under section 1211 and 1212 and not as a loss under section 165(a). However, there are numerous cases which have recognized that stock or other property which technically fitted precisely the statutory definition of capital asset had been acquired by a taxpayer for a purpose so directly connected with the trade or business of that taxpayer that the gain or loss resulting from the sale of such property was an ordinary gain or an *238 ordinary business loss deductible under section 165(a) or the comparable provisions of the Internal Revenue Code of 1939 and prior Revenue Acts, or an ordinary and necessary business expense deductible under section 162(a) or the comparable provisions of the 1939 Code or prior Revenue Acts. An early case involving such a situation was Helvering v. Community Bond & Mortgage Corporation, 74 F.2d 727 (C.A. 2, 1935), affirming a Memorandum Opinion of this Court. That case involved a situation in which the taxpayer had an agreement with another corporation to be its exclusive selling agent for certain stock. The arrangement proved harmful and embarrassing to the taxpayer because of the methods used by its agent. In order to cancel the contract the taxpayer purchased the stock of its agent corporation, cancelled the contract and dissolved the agent corporation. Upon the dissolution all of the assets were transferred to a third party in return for assumption by that party of the liabilities of the dissolving corporation, so that the taxpayer received no cash or other property upon the dissolution of the corporation. The taxpayer claimed a deduction for the amount it had paid *239 for the corporate stock. The Court concluded that the expenditure was not unlike an amount of money paid to secure cancellation of an unprofitable contract and that the amount paid for the stock was properly deductible as an ordinary and necessary business expense of the taxpayer. A number of cases involving similar circumstances have followed the holding in Helvering v. Community Bond & Mortgage Corporation, supra, one of which, Pressed Steel Car Co., 20 T.C. 198 (1953), involved a situation where the taxpayer was involved in a dispute with another corporation with respect to a contract previously entered into between the two. When negotiations to settle the differences between the parties proved unsuccessful, the taxpayer purchased all of the stock of the other corporation after the other corporation had transferred all of its assets, except the disputed contract, to a third party. After purchasing the stock the taxpayer dissolved the corporation. In holding that the amount paid by the taxpayer in Pressed Steel Car Co., supra, for the stock it purchased was deductible as an ordinary and necessary business expense, or a business loss, we *240 pointed out that the evidence showed that the only purpose for the purchase of the stock was to settle the claim and that the taxpayer had no intention of buying or holding the stock as an investment. We concluded that the amount paid by the taxpayer for the stock should be considered in accordance with the purpose for which it was paid in determining the tax consequences of the payment. Another type of situation in which it has been recognized that the loss resulting from the sale of stock is a business expense or an ordinary and not a capital loss is where a taxpayer acquires stock in order to obtain the necessary inventory to operate its business. Western Wine & Liquor Co., 18 T.C. 1090 (1952); and Edwards v. Hogg, 214 F. 2d 640 (C.A. 5, 1954). These cases involved stock purchased by wholesale liquor companies during the years of World War II to obtain the stockholders' right to purchase whiskey from the manufacturing corporation, the stock of which was purchased. The loss on the stock was considered to be, in substance, a part of the cost of the whiskey purchased due to the ownership of the stock. Electrical Fittings Corporation, 33 T.C. 1026 (1960), *241 involved a manufacturer of electrical fittings who joined with certain other persons in forming a corporation to produce the castings necessary for its operations when it was otherwise unable to satisfactorily obtain these products. When the necessity for such source of supply ceased, the taxpayer sold his stock at a loss which we held to be a deductible business expense. Smith & Welton v. United States, 164 F. Supp. 605 (E.D. Va., 1958), involved stock purchased by a department store in a corporation engaged in the dress supply business to assure a continuing supply of dresses from that supplier, which stock was sold at a loss when the taxpayer no longer needed the source of supply. The Court held the amount of the loss to be a deductible business expense. A loss on stock which became worthless was held to be an ordinary and necessary business expense or a business loss deductible as such where an individual was required to purchase the stock in order to maintain his position with the company he represented. Hagan v. United States, 221 F. Supp. 248 (W.D. Ark., 1963). The Supreme Court in Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955) *242 held that although contracts for the future purchase of corn met the technical definition in the Code of capital asset, the gain or loss resulting from the taxpayer's futures transactions was ordinary gain or loss and not capital gain or loss since the contracts were entered into as an integral part of its business to protect its manufacturing operation against a price increase of raw materials and to assure a ready supply of such materials for its future requirements. In Booth Newspapers, Inc. v. United States, 303 F. 2d 916 (Ct. Cls., 1962), the Court compared the "flexible approach" to the concept of capital asset taken by the Supreme Court in the Corn Products case to the conclusion reached in cases involving the acquisition of stock for the purpose of obtaining inventory or some comparable reason of business necessity. The case of Tulane Hardwood Lumber Co., 24 T.C. 1146 (1955) involved another situation in which a loss resulting from acquisition of property which does not technically come within the exclusion from the definition of "capital asset" contained in the Internal Revenue Code was treated as giving rise to an ordinary loss or a deductible *243 business expense. The facts showed that property was purchased for the purpose of enabling the purchasing taxpayer to carry on its ordinary business operations. In Tulane Hardwood Lumber Co., supra, we concluded that when certain debentures purchased by the taxpayer became worthless, the cost thereof was deductible in full since the taxpayer's action in purchasing the debentures was a "reasonable and necessary act in the conduct of its business" and the "loss of the purchase price was proximately related to that acquisition." In John J. Grier v. United States, 328 F. 2d 163 (C.A. 7, 1964), a deduction as an ordinary loss was allowed to a restaurant operator for the loss he sustained on the sale of stock he acquired to obtain a lease of operating premises. The guidelines laid down for determining the nature of the loss in the numerous cases dealing with the sale or worthlessness of stock or other property which does not technically come within the exclusions from the definition of capital asset require that a factual determination be made of whether the property was acquired as a reasonable and necessary incident to the conduct of the taxpayer's business. *244 If it is concluded that the property was so acquired the question arises of whether it was held as an investment after the purpose of its acquisition had ceased. See Gulftex Drug Co., 29 T.C. 118 (1957), affirmed per curiam 261 F. 2d 238 (C.A. 5, 1958), where the retention of stock after the original purpose for which it was purchased had disappeared caused the stock to take on the nature of an investment resulting in a capital loss upon its sale. See also Missisquoi Corporation, 37 T.C. 791, 797 (1962), involving similar facts. Under the facts in the instant case which we have set forth in some detail, we conclude that petitioner's purpose in acquiring the Bankers' stock was to enable it to obtain a satisfactory aviation insurance management contract, that the reason that petitioner retained the stock was to insure the retention of such contract, and that petitioner sold the stock only when forced to do so, thereby losing its contract. In our opinion petitioner's acquisition of the stock was a reasonable and necessary act in the conduct of its business. Its holding of the stock was likewise reasonable and necessary in the conduct of its *245 business. Petitioner at no time held the stock after the reason for its acquisition ceased. The loss upon the sale of the stock was sufficiently related to its acquisition to cause the loss to be deductible as an ordinary and necessary business expense under section 162(a) or as an ordinary loss under section 165(a). Respondent argues that petitioner failed to show that it exhausted all possibilities of obtaining an aviation insurance management contract with some company engaged in writing aviation insurance prior to arranging to purchase the Bankers' stock and also has failed to show that it could not have operated profitably under the terms of the new contract with more limited representation offered it by Lloyd's, London. In our opinion the evidence shows that petitioner made reasonable but unsuccessful efforts to secure an aviation insurance management contract which it considered would enable it to continue operating as an insurance management firm prior to its purchase of the Bankers' stock. The evidence also shows that operations under the new contract offered to petitioner by Lloyd's, London, would have drastically changed the nature of petitioner's operations. In the judgment *246 of petitioner's officers to accept that contract would have been detrimental to petitioner's interests. Based on the holdings in the numerous cases involving situations similar to that here involved, we hold that petitioner's loss on the sale of its Bankers' stock in 1960 is deductible as a business expense or an ordinary loss and that in addition petitioner in 1960 incurred a business expense or sustained an ordinary loss from its agreement to purchase additional Bankers' stock but that the amount thereof was only $99,000. The obligation to pay to O. Z. Hall the difference between the $20 per share and $3.50 per share was a joint one of petitioner and Irbco. We agree with respondent that although petitioner did pay the entire $198,000 which it and Irbco were required under their agreement to pay O. Z. Hall, petitioner has totally failed to show that had it chosen to pursue its rights, it would have been unable to be reimbursed for one-half of the amount by Irbco. W. Neal Irby testified in this regard to the effect that petitioner did consider Irbco to be obligated to reimburse petitioner for this $99,000. [1]
*247 The record is not complete on the financial condition of Irbco but does show that Irbco in the taxable years here involved owned a substantial building in Atlanta, Georgia and a fair inference from the record is that Irbco had the building pledged as collateral for the unpaid amount of the joint indebtedness of petitioner and Irbco to the Florida National Bank on the loan made from that bank for the purchase of Bankers' stock. The value of the building as compared to the indebtedness it was pledged to secure is not shown. There is certainly nothing in the record to justify a conclusion that Irbco would be unable to reimburse petitioner its portion of the loss on the contract to purchase the 12,000 shares of stock. We therefore hold that petitioner is not entitled to deduct the $99,000 that it paid which represented the obligation of Irbco. Respondent takes the position that the circumstances under which the advances were made by petitioner to Irby & Co. show that such advances did not constitute indebtedness within the meaning of that term as used in section 166(a) which provides that there shall be allowed as a deduction any debt which becomes worthless within the taxable year. *248 Respondent takes the position that if the advances did constitute indebtedness, such indebtedness was not uncollectible in 1960. Both of these contentions raise questions of fact and after study of all the facts of record, we agree with respondent in both of his contentions in regard to the advances made by petitioner to Irby & Co. Although there is reference to Irby & Co.'s being closely associated with petitioner in that they were both engaged in a type of insurance agency business, there is nothing in the record to show any such vital connection as to cause petitioner to make a loan to Irby & Co. for petitioner's own business interest. Petitioner does not contend that these loans were made because of Irby & Co.'s purchase of Bankers' stock and there is no evidence to so indicate. The stockholders of the two corporations were the same. The fair inference from the record is that petitioner could not reasonably expect repayment when some of the advances were made. This conclusion is supported by comparing the dates of the advances with dates of repayment and by the amount of the advances made after January 1, 1960, when the officers of Irby & Co. who were also petitioner's officers *249 were well aware of the dire financial circumstances of Irby & Co. In fact, W. Neal Irby referred to the fact with respect to a loan to Irby & Co. from the First National Bank by stating, "when the tent started falling, the First National Bank rightly said we want some collateral, it is obvious this stock is not worth as much as the loan. So I gave them some life insurance. This was in 1959." Obviously at a time in 1959 when the "tent started falling" petitioner's officers being the same as the officers of Irby & Co. knew the financial condition of Irby & Co., and at the time when the First National Bank "rightly wanted collateral" petitioner continued to make advances to Irby & Co. with no collateral, no notes, and not even, so far as the record shows, a simultaneous entry as a purported indebtedness on the accounts payable on the books of Irby & Co. These facts considered in connection with the other facts of record, such as the lack of any entry by petitioner of the advances on its regular books as distinguished from balance sheets of the amount as an account receivable and the lack of effort to collect the advances in 1960 when Irby & Co. ceased to be in the insurance business, *250 negates any reasonable intention by either party of an unconditional obligation by the borrower to repay. Absent an unconditional obligation by the borrower to repay an advance, the amount cannot be reasonably considered to be an indebtedness. Hoguet Real Estate Corporation, 30 T.C. 580, 601 (1958); Diamond Bros. Company v. Commissioner, 322 F. 2d 725 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court; and Ludwig Baumann & Co. v. Commissioner, 312 F. 2d 557 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court. Many of the cases cited by petitioner involve loans made by a stockholder to his corporation or some individual to another individual related to him in which the issue was not whether a debt was created but whether the debt was a business or nonbusiness debt. Those cases are not applicable here since the limitation on deduction of nonbusiness bad debts does not apply to a corporation. All those cases deal with whether the loan was so proximately related to the lender's trade or business as to constitute a business debt. In the instant case the question is whether a true indebtedness arose because of the advances and *251 under the facts here present we conclude that no such true indebtedness did arise. Even if the advances had been loans, the evidence shows that there were assets of Irby & Co. from which the indebtedness could have been collected in 1960 had petitioner chosen to press for collection. W. Neal Irby specifically verified the fact that he was indebted to Irby & Co. in an amount in excess of $32,000 and the books of the company show other assets as of December 31, 1960, of Irby & Co. in an amount of approximately $113,000. The only liabilities other than Irby & Co.'s indebtedness to petitioner and accrued expenses of $311.66 were an indebtedness to Irbco, another related company, in the amount of $56,000 and a purported indebtedness to the Trust Company of Georgia for a purchase of A. F. Irby, Jr.'s stock. In our view any agreement by Irby & Co. to assume the debt of A. F. Irby, Jr., to this bank was not an obligation of Irby & Co. which should properly be paid by that company until all creditors had been paid. The exact time of the contract between A. F. Irby, Jr., and Irby & Co. with respect to the sale of the Irbco stock held by A. F. Irby, Jr., is not shown. However, the surplus *252 shown on an unaudited balance sheet of Irby & Co. as of December 31, 1959, without provision for bad debts or any reduction in the investment account which by that time, the evidence indicates, was below its cost basis because of the Bankers' stock included therein, was only $20,839.69. Section 22-1828(d) of the Georgia Code[2] which is part of the 1938 Corporation Act of Georgia provides that a corporation may buy its own shares only out of surplus of its assets over its liabilities including capital stock except under circumstances now shown to exist in the instant case. Therefore even if the contract between Irby & Co. and A. F. Irby, Jr., for the stock purchased were entered into around the close of 1959, the evidence indicates that the corporation was not entitled to buy its own shares so as to deplete its assets available for payment of creditors. Brooks-Pruitt Tire Co. v. Brooks & Zuker Tire Co., 192 Ga. 644, 16 S.E. 2d 423 (1941). Cf. Miller Service v. Miller, 45 S.E. 2d 466, 469-470 (Ga. Ct. App., 1947). See also Fitzpatrick v. McGregor, 133 Ga. 332, 65 S.E. 859 (1909), for a discussion of the rights of creditors against a stockholder *253 who received assets from an insolvent corporation in a purported sale of his stock to that corporation. Furthermore, the general law appears to be that even if the contract to purchase its own stock is entered into by a corporation at a time when it has the surplus to make the purchase, payment may not be made at a time when the corporation lacks such surplus unless all creditors of the corporation have been paid. See Kleinberg v. Schwartz, 87 N.J. Super. 216, 208 A. 2d 803 (1965); and Robinson v. Wangemann, 75 F. 2d 756 (C.A. 5, 1953): In Robinson v. Wangemann, supra, the Court specifically pointed out that it is immaterial that the corporation was solvent and had sufficient surplus to make payment when the agreement to purchase its own stock was entered into. To have payment under such agreement be proper when the interests of creditors are involved the corporation should be solvent and have sufficient surplus to prevent injury to creditors when the actual payment is made. *254 The facts here show that as of the end of 1960 Irby & Co. had assets of approximately $145,000 with which to pay the $107,568.69 advances by petitioner and the $56,000 advances by Irbco since the $63,000 note to the First National Bank was a liability purported to be assumed in payment for the purchase of its own stock from A. F. Irby, Jr. There is nothing in the record which indicates that the debt of A. F. Irby, Jr. and other assets of Irby & Co. were not worth the amount at which they were carried on the books of Irby & Co. The facts here show that petitioner chose not to press for payment because of the relationship of the parties. The testimony of W. Neal Irby in effect so states. He stated that he felt that in paying petitioner, Irby & Co. would be paying its stockholder-officers instead of outsiders and from a moral attitude as well as the viewpoint of his reputation in the community, he wanted to see that outsiders were paid. When a taxpayer corporation for reasons personal to its officers chooses not to pursue its legal rights to collect a debt which is collectible if such legal rights are pursued, it is not entitled to a bad debt deduction for such debt. Petitioner contends *255 that if its advances to Irby & Co. are not deductible as bad debts, it should be entitled to a deduction under section 162(a) of the amounts advanced as an ordinary and necessary expense incurred in its trade or business. Respondent points out that only $39,500 of the advances were made in the taxable year here in issue, 1960, and therefore only such amount of the advances could be considered to be business expense deductible in 1960. Respondent contends that the evidence here fails to establish that any portion of the advances were necessary to petitioner's own business operations. We agree with respondent. There is some reference in the record to the advances being made in part for selfish reasons because petitioner's reputation might have suffered "if anything had happened" to Irby & Co. There is also some evidence that petitioner used some of the same field offices as were used by Irby & Co. The fair inference from the record as a whole, however, is that A. F. Irby, Jr., and W. Neal Irby who were the principal stockholders and officers of both petitioner and Irby & Co. were interested in preserving Irby & Co. because it was a family business. Any interest in "reputation" was *256 their personal reputations and family reputation as distinguished from petitioner's corporate "reputation." There is no substantial showing of business necessity for petitioner to keep Irby & Co. in the insurance business. There is no showing of any unfavorable results to petitioner from Irby & Co.'s ceasing the insurance business in March 1960. The evidence as a whole does not support the conclusion that the primary reasons for the advances by petitioner to Irby & Co. were petitioner's own business interests as distinguished from the interests of its stockholders who were, of course, also stockholders of Irby & Co.
Where the same parties are the stockholders and principal officers of two separate corporations, it is difficult to draw a line between the corporate interests and the interests of the stockholders since the two in economic fact merge. However, petitioner has the burden of establishing its right to a deduction as an ordinary and necessary business expense and to do so must show that the payment which it claims to be deductible was necessary to its own corporate business operation as distinguished from the general financial benefit of the mutual stockholders and officers *257 of two related corporations. The vague testimony in this case as to the mutual family interests in the two corporations falls far short of establishing petitioner's right to deduct the advances it made to Irby & Co. in 1960 as an ordinary and necessary business expense. The cases relied on by petitioner, such as Lutz v. Commissioner, 282 F. 2d 614 (C.A. 5, 1960), reversing a Memorandum Opinion of this Court; L. Heller & Son, Inc., 12 T.C. 1109 (1949); Charles J. Dinardo, 22 T.C. 430 (1954); and Cubbedge Snow, 31 T.C. 585 (1958), all involved payment of indebtedness of another to protect the payor's business interests. In each of these cases the payment was made by the taxpayer involved with no intention on the part of either party that he would be reimbursed in any manner. In each of those cases the Court concluded that the payment was made for a business reason of the payor and in no way partook of the nature of an investment in or loan to the company on whose behalf the payments were made. These cases are distinguishable on their facts from the instant case. There are many indications in the record in the instant case that *258 petitioner's intention was that the amounts it advanced to Irby & Co. were to be repaid to it if Irby & Co. prospered so that it could make repayment and that petitioner intended the amounts to in effect be investments on behalf of petitioner's stockholders in Irby & Co. if circumstances did not occur to permit Irby & Co. to repay the amounts. Although we have concluded that the advances did not create debts within the meaning of section 166(a), this is because petitioner did not intend or reasonably expect to be repaid in all events regardless of the success of the business of Irby & Co. The evidence does show that petitioner's officers hoped that Irby & Co. could overcome its business difficulties and repay petitioner the amounts of the advances and fails to show that petitioner intended the advances as payments of its own necessary expenses. See W. D. Roussel, 37 T.C. 235, 244 (1961), for distinction between a payment of a business expense and an intention to create a debtor-creditor relationship. We hold that petitioner is not entitled to deduct in 1960 any portion of its advances to Irby & Co. as a business expense. Decision will be entered under Rule 50. Footnotes
1. W. Neal Irby's testimony was as follows: Q. Have you attempted to obtain any agreement from Irbco to pay, obtain this amount? A. Any number of times it has been agreed that if by chance we should happen to sell the building for more than the obligations, that then we would discuss what was to be done with the remainder. Q. In other words, Irbco will pay Southeastern the portion of its obligation if and when it is able? A. Yes, but the chances of it ever being able are mighty slim, I think. I made a lot of efforts in the last few months to try to get rid of that property, and those efforts have not be fruitful.↩
2. Sec. 22-1828(d), Code of Georgia
(d) Buy and sell its own stock. To purchase, hold, sell and transfer shares of its own capital stock: Provided, that no such corporation shall purchase its own shares of capital stock except from the surplus of its assets over its liabilities, including capital stock: Provided, further, that shares of capital stock shall be purchased only from earned surplus where there is outstanding another class of shares having a distribution preference over the shares purchased. Anything to the contrary notwithstanding, a corporation may in any event acquire its shares to collect or compromise in good faith a debt, claim or controversy against the corporation, or in settlement of a debt owing to the corporation where necessary to protect the corporation against loss, or to discharge an obligation of the corporation to a shareholder who has exercised the right of dissent from a proposed corporate merger or consolidation, as provided in this Chapter; or to discharge an obligation of the corporation to a shareholder who has exercised his right of conversion of shares pursuant to the charter. No shares subject to redemption at the option of the corporation shall be purchased at a price exceeding the redemption price thereof. Shares of its own capital stock held by the corporation shall not be voted directly or indirectly nor counted as outstanding for the purpose of any stockholders' quorum or vote, or dividends or distributions of any kind whatsoever.↩